IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 8, 2012 Session Heard at Memphis

## STATE OF TENNESSEE v. PRINCE ADAMS

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 0606987    James M. Lammey, Jr., Judge**

_____

**No. W2009-01492-SC-R11-CD - Filed May 16, 2013**

_____

The defendant was convicted of first degree premeditated murder and received a life sentence.  In his appeal to the Court of Criminal Appeals, he alleged that the evidence was insufficient to support his conviction; that a discharged alternate juror improperly communicated with the jury foreman; and that the trial court erred by failing to exclude from the evidence certain photographs and recordings and by failing to provide a special jury instruction on diminished capacity.  The Court of Criminal Appeals affirmed the conviction and sentence.  This Court granted permission to appeal to address whether the communication by the alternate juror to the foreman entitled the defendant to a new trial.  Because the State successfully rebutted the presumption of prejudice that accompanies an improper communication with a juror, we find no error and, therefore, affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal
Appeals Affirmed**

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Brett B. Stein (at trial and on appeal) and Larry Diamond (at trial), Memphis, Tennessee, for the appellant, Prince Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Cameron L. Hyder, Assistant Attorney General; Rachel E. Willis, Senior Counsel; William L. Gibbons, District Attorney General; and Patience Branham and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Facts and Procedural History

On the night of April 16, 2006, Prince Adams (the "Defendant") took two Ambien[1] pills while at his mother's residence in Shelby County. In the early morning hours of the following day, April 17, 2006, the Defendant left his mother's residence in an automobile driven by his girlfriend, Ohrdra Flowers (the "victim").[2] At some time later in the day, the Defendant was involved in a minor car accident while driving the victim's car. When Officer Courtney Cunningham of the Memphis Police Department arrived at the accident scene at approximately 8:50 p.m., he asked the Defendant whether he had consumed any alcohol. The Defendant, who appeared incoherent and unsteady on his feet, admitted that he had taken the Ambien to help him sleep. When Officer Cunningham noticed blood on the front seat of the car, the Defendant claimed that he had been involved in a fight with his "girlfriend's boyfriend" and had "cut him." Officer Cunningham did not inquire further about the blood but turned his attention to determining whether the Defendant had been driving under the influence of an intoxicant. Because of the Defendant's large size and incoherent state, Officer Cunningham decided not to conduct any field sobriety tests and, instead, issued a misdemeanor citation and called for an ambulance to transport him to the hospital.

Later that evening, the Defendant checked into the Amerisuites Motel, which was located across the street from the hospital, and paid in cash for two nights. The next day, April 18, 2006, he telephoned his cousin, Andra Smith, to discuss a fight he had with the victim. He asked Smith to meet him so he could give him some audiotapes. Because Smith was unable to go to the motel, the Defendant left the tapes in Smith's car. In one of the tapes, the Defendant recounted his actions over the prior two days and made the statement that he would kill the victim if he discovered that she was cheating on him. After hearing this, Smith tried to make contact with the victim but was unsuccessful. Later, the Defendant telephoned to ask Smith to pick him up at the motel because police officers were present. When Smith arrived, the police officers were still at the motel, but the Defendant was allowed to leave with Smith. Smith then drove to the residence of the Defendant's father. When no one answered the door, the Defendant became upset and walked down the street at a hurried pace, crying and insisting upon seeing the victim. The Defendant then informed Smith that on the night of April 16, 2006, he had taken two Ambien pills at his mother's residence before leaving with the victim in her vehicle. While they were driving, the victim admitted to the Defendant that she had cheated on him, and he killed her with his

_____

[1] Ambien is a prescription sleep-aid medication.

[2] Consistent with the policy of this Court, although much of the record refers to the victim as "Ohdra" or "Nicki," we have stated her name as "Ohrdra Flowers" as provided in the indictment and charging documents.

pocketknife. After describing these events, the Defendant refused to return to Smith's car or to turn himself in to the police until he saw the victim's body. Smith agreed to take the Defendant to view the body on the condition that the Defendant surrender to the police afterward.

According to Smith, the Defendant led him to a park near an elementary school where they found the body lying among the rocks on the slope of a drainage ditch. Upon seeing the body, the Defendant became hysterical, climbed down the slope, and shouted repeatedly, "[S]he didn't deserve this." When he reached the victim, the Defendant took his pocketknife from her body, removed his shirt, placed a photograph of the victim over his chest, and started gesturing as if to stab himself. Smith pled for the Defendant to stop and called 911. The police responded to the call and took the Defendant, who had not seriously injured himself, into custody.

During the police interview, the Defendant admitted responsibility for the victim's death and provided a sworn statement to that effect. He stated that the last time he saw the victim alive was in her car on April 17, 2006, between 12:00 a.m. and 1:30 a.m. According to the police, the Defendant explained that when the victim bluntly informed him that she had failed to answer his phone calls because she was having sex with another man, "[he] lost it, and [he] attacked her." He then acknowledged that he had disposed of her body in a park next to Cromwell Elementary School. The Defendant claimed that he blacked out after learning of the victim's infidelity and asserted that he only knew the details of her death and the location of her body because of a dream.

The police detected several inconsistencies in the Defendant's statement. For example, although the Defendant asserted that he had stabbed the victim from the passenger side of her car, he also claimed that he had been driving her car. Moreover, the autopsy report included several color photographs indicating that the vast majority of the victim's twenty-seven stab wounds were inflicted to the left side of her body around her neck and breast, which indicated that she was stabbed by the Defendant while he was either sitting in the driver's seat or standing outside of the driver's side door. Forensic testing confirmed that the blood of the victim was in her car and on the Defendant's pocketknife.

The Defendant's trial was heard by a jury in the Criminal Court for Shelby County over the course of five days in March of 2009. At the conclusion of the trial but before jury deliberations, the trial court randomly selected two of the fourteen jurors as alternates, excused them from the courtroom, and discharged them from further service. The trial court then delivered a few final instructions to the remaining twelve members of the jury, who deliberated for three hours before adjourning for the night. After further deliberations on the next day, the jury returned a verdict of guilt as to the charge of first degree premeditated

murder. Following the announcement of the verdict, Bently Goodwin, the jury foreman, informed the trial court that one of the discharged alternate jurors had left him a note in his hotel room the day before, stating something to the effect of "Jackie and I think guilty, first-degree murder – or guilty, first degree."[3]

At the hearing on the Defendant's motion for a new trial, the jury foreman testified that he had found the note in his room on the evening after the alternate jurors were discharged but before the jury began its deliberations.[4] He stated that he threw the note away, chose not to share the contents or existence of the note with any of the other jurors, and made no mention of the note during the jury's deliberations. Although the Defendant objected to any testimony by the foreman as to whether the note actually affected his opinion of the case, the trial court ruled that the State would be permitted "to ask whatever questions they need to ask to get . . . all the information needed," cautioning that only proper information would be considered. In response to the State's questioning, the foreman testified that the note did not impact his or any other juror's assessment of the evidence in any way. The trial court denied the Defendant's motion for a new trial, holding that there was no likelihood that the note or its contents had "actually affected deliberations."

On direct appeal to the Court of Criminal Appeals, the Defendant argued that he should receive a new trial because the note left by the discharged alternate juror was an improper communication that affected the verdict. He also asserted that the evidence was insufficient to support his conviction for first degree murder, that the trial court erred by admitting certain photographs of the victim and the audiotape recordings made by the Defendant, and that the trial court should have granted his request for a special jury instruction on diminished capacity. The Court of Criminal Appeals affirmed the Defendant's conviction and sentence. State v. Adams, No. W2009-01492-CCA-R3-CD, 2011 WL 4375332, at *15 (Tenn. Crim. App. Sept. 21, 2011). Although the Defendant presented these same issues for review in this Court, we granted his application for permission to appeal primarily to address whether the note received by the foreman qualifies as extraneous prejudicial information or an outside improper influence that gave rise to a presumption of prejudice, and, if so, whether the State successfully rebutted the presumption of prejudice

---

[3] According to the jury foreman, "Jackie or something like that" was the female alternate juror who was named in the note, which was left by the male alternate juror who had shared a hotel room with the foreman. The record indicates that the names of the alternate jurors are Yolanda Bynum and Sanford Ipock.

[4] This testimony conflicts with the timeline as documented in the record, which indicates that the jury began its deliberations shortly after the alternates were excused. The statements of the trial court during the hearing also confirm that the alternates were excused immediately prior to the jury beginning its deliberations, such that the foreman could not have discovered the note until some time after the jury had deliberated for three hours and before deliberations resumed the following morning.

that accompanies such communications.

## II. Analysis
## A. Juror Misconduct

The Defendant first asserts that the trial court erred by failing to grant a new trial because of the improper note left for the jury foreman by the discharged alternate juror. Specifically, the Defendant argues that because the note included "a direct comment on the issue of guilt," it was an improper communication that tainted the jury deliberation process. The Defendant further claims that the State failed to rebut the presumption of prejudice that accompanies any kind of juror misconduct.

Our analysis begins with the proposition that every criminal defendant has a constitutional right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; see also State v. Sexton, 368 S.W.3d 371, 390 (Tenn. 2012). Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge. Caldararo ex rel. Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990). When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable. See State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984). Extraneous prejudicial information has been broadly defined as information "coming from without." State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987) (internal quotation marks omitted). More specifically, extraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. Robinson v. Polk, 438 F.3d 350, 363 (4th Cir. 2006); Blackwell, 664 S.W.2d at 688-89; see also 27 Charles Alan Wright et al., Federal Practice and Procedure § 6075 (2d ed. 2012) [hereinafter Wright]. An improper outside influence is any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." Remmer v. United States, 347 U.S. 227, 229 (1954); see also Blackwell, 664 S.W.2d at 689; Wright § 6075.

A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence. Caldararo, 794 S.W.2d at 740-41. In determining whether evidence is admissible to challenge a verdict, trial courts are guided by Tennessee Rule of Evidence 606(b), which provides as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or

concerning the juror's mental processes, <u>except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion</u>; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (emphasis added). As indicated, once the challenging party has made the initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless. <u>Walsh v. State</u>, 166 S.W.3d 641, 647 (Tenn. 2005) (citing <u>Blackwell</u>, 664 S.W.2d at 689; <u>State v. Parchman</u>, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997)).

At a hearing after the conclusion of the trial, the jury foreman testified that one of the discharged alternate jurors left a note in his hotel room to the effect that both of the alternates believed that the Defendant was guilty of first degree premeditated murder. The State has properly conceded that the note qualified as an improper outside influence because it was a direct, unauthorized "private communication . . . with a juror during a trial about the matter pending before the jury." <u>Remmer</u>, 347 U.S. at 229. "[A] discharged alternate [juror] is no longer a member of the jury since the function of an alternate juror ceases when the case has been finally submitted." <u>State v. Bobo</u>, 814 S.W.2d 353, 355 (Tenn. 1991). Because the Defendant has made the requisite initial showing that a member of the jury was subjected to an improper outside influence by a discharged alternate juror, our primary concern is whether the State successfully rebutted the presumption of prejudice that accompanies such misconduct.

In <u>Walsh</u>, this Court settled any question as to the scope of inquiry permitted under Tennessee Rule of Evidence 606(b), explicitly holding that the rule "prohibits introduction of juror testimony concerning the effect on the juror of an improper communication . . . during jury deliberations." 166 S.W.3d at 643. The terms of the rule therefore prohibit the State from introducing what might otherwise be perceived as the most relevant evidence to rebut the presumption of prejudice—juror testimony as to whether the extraneous prejudicial information or improper outside influence actually had any effect on the verdict. While we acknowledge the limitations this presented to the State in its efforts

to overcome the presumption, there are sound policy reasons for the exclusion of such proof.[5] The proper procedure under Rule 606(b) is

> for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly was said, to determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict.

Walsh, 166 S.W.3d at 648-49 (emphasis added) (quoting Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir. 1991)).

In this instance, the trial court permitted the jury foreman, over the objection of the Defendant, to testify that in his opinion the note did not impact his or any other juror's view of the proof in any way and had no impact on the jury's verdict. Based upon the principles confirmed in Walsh, the trial court clearly erred by allowing the State "to ask whatever questions they need[ed] to ask to get . . . all the information needed" and by allowing the foreman to testify as to what role the note may have played in the jury's thoughts or

---

[5] In Caldararo, our Court of Appeals commented upon the policy reasons for our rule:

> [Rule] 606(b) represents a compromise between important public policies. It enables the courts to protect the litigants from verdicts tainted by extraneous prejudicial information or outside influence. At the same time, it recognizes the importance of the inviolate nature of a jury's deliberations.
>
> The rule precludes inquiries into the jury's deliberative process while allowing juror testimony concerning objective incidents or events that constitute external or extraneous influences on the jury. Thus, it insures that jurors will not be guarded in their deliberations for fear of later scrutiny by others. It also prevents jurors whose views are in the minority from manipulating the system by repudiating the verdict and thereby requiring a new trial.

794 S.W.2d at 741-42 (emphasis added) (citations omitted).

In Walsh, this Court observed that our Rule 606(b) had its origin in Federal Rule of Evidence 606(b) and the common law rule precluding the "admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." 166 S.W.3d at 646 (quoting Tanner v. United States, 483 U.S. 107, 121 (1987)); see also Blackwell, 664 S.W.2d at 688; Carruthers v. State, 145 S.W.3d 85, 92-93 (Tenn. Crim. App. 2003) (noting that the public policy considerations behind Rule 606(b) "include the prevention of jury harassment, encouragement of free and open jury deliberation, promotion of finality of verdicts, and the reduction of the incentive for jury tampering").

discussions. Nevertheless, for the reasons discussed below, we affirm the ruling of the Court of Criminal Appeals that the error was harmless under all of the circumstances.

Although we have confirmed that "juror testimony concerning the effect of [extraneous prejudicial] information or [an improper outside] influence on the juror's deliberative processes is inadmissible," id. at 649, there are other ways for the State to rebut the presumption of prejudice. For example, in Walsh, wherein a court officer was accused of making an improper comment to a juror, the State could have attempted to rebut the presumption by calling the court officer to testify as to whether he actually made the statement, or by questioning other members of the jury as to whether they heard the statement. Id. Likewise, in the case before us, the State could have questioned other members of the jury as to whether they read the note or were told about the note, or could have subpoenaed the discharged alternate jurors to determine whether the note was actually written and whether it included their opinion as to the Defendant's guilt. Unlike the facts in Walsh, however, these additional steps were unnecessary because the inadmissible testimony of the jury foreman was not the only testimony offered by the State to rebut the presumption of prejudice in this instance.

First, the jury foreman's testimony as to the circumstances surrounding his receipt of the note, including the location of the note and the time of day at which he found the note in relation to the trial court proceedings, was admissible under Tennessee Rule of Evidence 606(b).[6] Second, Rule 606(b) permitted the foreman to state his recollection of the contents of the note. Finally, it was proper under Rule 606(b) for the foreman to testify as to what he did with the note after he read it and whether he told anyone else about the note or its contents. In our assessment, therefore, the State presented sufficient admissible evidence to carry its burden of rebutting the presumption of prejudice. In reaching this conclusion, we have found it helpful to examine the various tests utilized by the federal circuit courts of appeals when applying Federal Rule of Evidence 606(b), upon which our Rule 606(b) is based. See Blackwell, 664 S.W.2d at 688 (adopting Federal Rule of Evidence 606(b) "as the rule governing the exclusion and admissibility of evidence to impeach a jury verdict in [Tennessee]").

The Second Circuit Court of Appeals utilizes an objective test that considers the entire record and the circumstances surrounding the juror's exposure to the external influence, focusing on the nature of the information or contact at issue and the probable effect the external influence had upon a hypothetical average juror. United States v. Farhane, 634 F.3d

_____

[6] As indicated, the foreman's testimony in this regard was somewhat inconsistent with the record; however, any factual discrepancies were for the trial court to consider in weighing the credibility of the foreman's testimony and did not affect the admissibility of such testimony under Rule 606(b).

127, 169 (2d Cir. 2011). The Third Circuit conducts a similar objective analysis, considering the probable effect of the external influence on a hypothetical average juror by inquiring into the nature of the external influence, the timing of the juror's exposure, and the identities of the involved parties. United States v. Console, 13 F.3d 641, 666-68 (3d Cir. 1993). The Eighth Circuit employs a slightly more detailed objective test for determining if an external influence has likely affected a typical juror, considering

> (1) whether the extrinsic evidence was received by the jury and the manner in which it was received; (2) whether it was available to the jury for a lengthy period of time; (3) whether it was discussed and considered extensively by the jury; (4) whether it was introduced before a verdict was reached and, if so, at what point during the deliberations was it introduced; and (5) whether it was reasonably likely to affect the verdict, considering the strength of the government's case and whether it outweighed any possible prejudice caused by the extrinsic evidence.

United States v. Blumeyer, 62 F.3d 1013, 1017 (8th Cir. 1995).

We believe that the analysis in Walsh, as supplemented by a combination of the factor tests employed by the federal circuit courts of appeals, provides the proper framework for determining the probable, objective effect upon a verdict of a juror's exposure to either extraneous prejudicial information or an improper outside influence. In determining whether the State has rebutted the presumption of prejudice in circumstances such as these, trial courts should consider the following factors: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial.[7] No single factor is dispositive. Instead, trial courts should consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict. See Walsh, 166 S.W.3d at 649. Applying these factors to the case before us, we find no reasonable possibility that the note received by the jury foreman altered the verdict.

As to the first factor, the nature and content of the information or influence is best determined by an inquiry into the identities of the parties involved, the substance of the

---

[7] While we recognize that the federal circuit courts of appeals have applied their factor tests to a hypothetical average juror, we find it more consistent with Tennessee Rule of Evidence 606(b) and the Court's statements in Walsh to conclude that our trial courts should consider these factors in light of the specific jurors, facts, evidence, and circumstances of each case.

communication, and how the exchange of information occurred. The jury foreman testified that after the conclusion of the trial he discovered a written note left by the discharged male alternate juror indicating that each of the alternates believed the Defendant to be guilty as charged. While the improper communication in this case was not a face-to-face conversation between a juror and a third party, it nevertheless was an unauthorized communication from a third party because, as indicated, a discharged alternate juror is no longer a member of the jury. See Bobo, 814 S.W.2d at 355. In this instance, however, while the alternate juror's communication to the foreman was improper, it did not impart upon the foreman any extrajudicial evidence. Throughout the trial process an alternate is in all other respects a juror, hearing all of the evidence and listening to the instructions provided by the trial judge. The note merely reflected the opinion of the two alternate jurors based upon the proof presented during the course of the trial—the very same evidence known to the foreman—and made no reference to any part of the testimony or the others serving on the jury.

This case differs significantly from other cases where convictions have been set aside or civil verdicts have been reversed because jurors have conducted independent research on issues presented at trial, shared their own personal knowledge of a case, or initiated a conversation with a member of the prosecutor's office or a trial witness. See, e.g., Blackwell, 664 S.W.2d at 688 (reversing defendant's conviction for sale of alcoholic beverages to a minor because, during trial, a juror discussed the defendant's guilt with the mother of the minor who had purchased the alcohol); Briggs v. State, 338 S.W.2d 625, 626, 628 (Tenn. 1960) (reversing defendant's conviction for voluntary manslaughter because one juror, who was a neighbor of the defendant, told the other members of the jury that the defendant had killed his brother, had a bad temper, and would "kill you if he got mad"); Martin v. Opryland USA, Inc., No. 01-A-01-9412-CV-00567, 1995 WL 322632, at *2, *4 (Tenn. Ct. App. May 26, 1995) (granting defendant a new trial because one juror, who was a nurse, conducted independent medical research on the plaintiff's injuries and shared her findings with the other jurors during deliberations). Here, the foreman neither instigated the communication nor sought out the discharged alternate jurors' opinions. Moreover, the foreman's lack of interest in the contents of the note is evidenced by the fact that he did not reveal to the other jurors either the existence of the note or its contents. This factor favors the State.

The second factor, the number of jurors exposed to the information or influence, also favors the State. The foreman testified that he did not inform the other jurors about either the existence or the contents of the note, and there was no evidence presented to contradict his testimony in that regard. Cf. Walsh, 166 S.W.3d at 644-45 (observing that the trial court accredited testimony of one juror who "was convinced that the other members of the jury also heard the officer's remark"). Although in this case the exposure of the note was limited to the foreman, we caution that when extraneous prejudicial information or an improper outside

influence is brought to bear upon even one juror it may be sufficient to set aside a verdict if there is a reasonable possibility that the verdict was tainted. Fullwood v. Lee, 290 F.3d 663, 668 (4th Cir. 2002) ("[I]f even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury."); see also Parker v. Gladden, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."); Blackwell, 664 S.W.2d at 689 (holding that a presumption of prejudice arises if "some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors").

The third factor, the manner and timing of the exposure to the juror(s), is neutral under these circumstances. The manner of the exposure tips the scales favorably for the State because the foreman was alone when he discovered the note upon returning to his hotel room. The timing of the exposure, however, is more favorable to the Defendant because the foreman discovered the note during an overnight break in the process of deliberation. Of course, these circumstances are in contrast to other cases resulting in new trials where jurors have been exposed to extraneous prejudicial information or an improper outside influence while in the jury room during active deliberations, when a juror could feel pressured to vote in a particular way. See, e.g., Walsh, 166 S.W.3d at 644-45 (granting new trial because a court officer entered the jury room during deliberations and told the jury that it was required to reach a decision); Blackwell, 664 S.W.2d at 688 (granting new trial because, prior to deliberations, a juror discussed the merits of the case with an interested third party and then entered the jury room immediately proclaiming the defendant's guilt). Nevertheless, allowing an alternate juror to assert his or her opinion and potentially influence jurors desecrates the sanctity of the jury of twelve. The presence of alternate jurors in the jury room during deliberations "is contrary to the common law[ and] the principles embedded in the concept of the jury trial." Patten v. State, 426 S.W.2d 503, 506-07 (Tenn. 1968) (reversing conviction because an alternate juror was permitted to retire with the empaneled jurors); see also Tenn. R. Crim. P. 24(f)(2)(A) ("A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict."). Even though, in this instance, the alternate jurors did not enter the jury room during active deliberations, the timing favors the Defendant because the deliberation process had already begun.

Because Rule 606(b) prohibits inquiry into the subjective impact upon a jury verdict, a consideration of the weight of the State's evidence introduced at trial is, as the fourth and final factor in our analysis of these circumstances, helpful in determining the possible impact any extraneous prejudicial information or improper outside influence had upon the verdict. In our view, the State presented overwhelming evidence of the Defendant's guilt, including a recorded statement to the police in which he admitted to killing the victim. The State also

presented specific evidence as to premeditation, which included the Defendant's recorded statement that he would kill the victim if he discovered that she had cheated on him and the numerosity of stab wounds inflicted upon the victim.

In summary, even without any consideration of the testimony of the jury foreman that should have been excluded, the State presented sufficient, admissible evidence to rebut the presumption of prejudice that accompanies an improper outside influence upon the jury. Because we have found no reasonable possibility that the note from the discharged alternate juror to the jury foreman affected the verdict, the Defendant is not entitled to relief on this issue.

As a final matter, because the right to a trial by an impartial jury is grounded in the federal and state constitutions, a trial court's analysis under Tennessee Rule of Evidence 606(b) should be reviewed by the appellate courts as a mixed question of law and fact. See Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 305 (Tenn. 2005) ("A constitutional claim that is resolved after an evidentiary hearing generally presents a mixed question of law and fact."). In consequence, this issue is subject to the de novo standard of review. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). The trial court's factual findings—such as the credibility and weight to be given a juror's testimony or the weight of the evidence presented at trial—should be reviewed de novo, accompanied by a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); Fields, 40 S.W.3d at 458. However, the trial court's conclusions of law—such as whether a jury's verdict was affected by extraneous prejudicial information or an improper outside influence—should be reviewed under a purely de novo standard, with no accompanying presumption of correctness. Fields, 40 S.W.3d at 458.

### B. Admission of Photographs

At trial, the Defendant objected to the introduction of several different photographs of the victim, including one portrait-style photograph of the victim that was taken when she was alive, seven photographs that were taken where the body was found, and eight photographs that were taken during the autopsy. The trial court, after conducting hearings outside of the presence of the jury and allowing argument as to the admissibility of each of the photographs at issue, permitted the introduction of the portrait-style photograph, the seven crime scene photographs, and six of the eight autopsy photographs.[8] Although the Defendant did not challenge the admissibility of the autopsy photographs in his appeal to the Court of Criminal Appeals or to this Court, he does contend that the portrait-style photograph and the crime scene photographs should have been excluded as irrelevant and unduly

---

[8] One of the autopsy photographs was introduced after being cropped to omit certain portions. Two of the autopsy photographs were excluded altogether.

prejudicial.

In order to be admitted as evidence, a photograph must be relevant to an issue decided by the trier of fact and its probative value must not be outweighed by any unfair prejudicial effect that it may have upon the trier of fact. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); see Tenn. R. Evid. 401–403. In making this assessment, trial courts should consider the questions of fact to be presented to the jury and any evidence presented during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). The admission of photographs is generally within the discretion of the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. State v. Young, 196 S.W.3d 85, 105 (Tenn. 2006) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)).

In this instance, the trial court permitted the State to display the portrait-style photograph of the victim for the purpose of showing the existence of a life-in-being. The Court of Criminal Appeals found this to be error because the photograph did not qualify as relevant evidence:

> [T]he photographs taken of the victim at the crime scene amply sufficed to prove her existence. The issue of [her] life or existence was not a matter of dispute at trial. Consequently, . . . the decision to admit the photograph constituted error.
>
> Indeed, the State . . . does not mount a serious effort to defend the trial judge's determination that the photograph of the victim taken while alive was relevant . . . . Rather, the State asserts that . . . any error that may have occurred [was] harmless in light of the overwhelming evidence against the [D]efendant.

Adams, 2011 WL 4375332, at *6; see also Tenn. R. Evid. 401–403. Over the years, this Court has consistently cautioned the State against the introduction of such photographs as evidence because they typically lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury. See, e.g., Young, 196 S.W.3d at 106 (finding error in the trial court's admission of childhood photographs of the victim and calling for trial courts to "understand the proof and theory of the case, and whether there is a real dispute about the issue the evidence is to prove" (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 403.[5] (5th ed. 2005))); State v. Cole, 155 S.W.3d 885, 911-12 (Tenn. 2005) (recognizing that although "[a] family photograph may be relevant to establish the victim's identity as the person killed," "a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence"); State v. Nesbit, 978 S.W.2d 872, 902 & n.3 (Tenn. 1998) (finding no error in admission of photograph taken

while victim was alive but recognizing that "where the victim's identity has already been proven, further proof may be cumulative and, therefore, inadmissible"); State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981) ("[I]t would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury.").

While we agree with the Court of Criminal Appeals that it was error to admit the portrait-style photograph into evidence, the Defendant is not entitled to relief on appeal if the error had no effect on the results of the trial. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial. See Cole, 155 S.W.3d at 912 (finding a portrait-style picture of the victim taken prior to his murder to have no prejudicial effect on the defendant's trial). If a photograph should have been excluded because it adds "little or nothing to the sum total of knowledge of the jury," the admission of the photograph, unless somehow prejudicial because of its content, typically qualifies as harmless. See Dicks, 615 S.W.2d at 128 (finding harmless error in admission of victim's "before" photograph); see also Young, 196 S.W.3d at 106 (finding harmless error in admission of victim's childhood photograph despite its potential to stir the jury's sympathy); State v. Richardson, 697 S.W.2d 594, 597 (Tenn. Crim. App. 1985) ("As to the photographs of [the victim taken before and after her murder], we find no prejudicial error in their admission.").

In this instance, the error was clearly harmless. Nevertheless, the Court of Criminal Appeals properly cautioned the State against the admission of photographs lacking in relevance, "which have the potential to undermine and place in jeopardy the outcome of the entire judicial proceedings." Adams, 2011 WL 4375332, at *6; see also State v. Richardson, 995 S.W.2d 119, 128 (Tenn. Crim. App. 1998) ("[W]e hasten to add that the fact that we hold the error to be harmless in the present case should not be taken as precedent for similar improper argument in the future."). Prior to admitting photographs of victims taken while they were alive, trial courts must determine whether the photographs are relevant by considering whether the purported use of the photograph—such as depicting a life-in-being—is a disputed issue at trial.

The Defendant also challenged the admission of the photographs taken where the body was found. Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se. State v. Jordan, 325 S.W.3d 1, 86 (Tenn. 2010). This Court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and

horrifying character." <u>Banks</u>, 564 S.W.2d at 950-51.

Here, the trial court carefully considered the relevance and the possible prejudicial effect of each photograph at issue prior to overruling the Defendant's objections to their admission, finding that they were relevant to show the extent of the victim's injuries and the length of time the body remained undiscovered. The trial court also ruled that the photographs served to illustrate the testimony of the investigating officer and to establish the intent and state of mind of the Defendant. In our view, the number and nature of the wounds, along with the manner and timing of disposal of the body, were relevant to the issue of premeditation. Although some of the photographs were especially graphic, the trial court did not find that they were "gruesome" or "horrifying," and we agree with that assessment. In summary, the trial court did not abuse its discretion by concluding that the probative value of the crime scene photographs was not substantially outweighed by the danger of unfair prejudice.

### C. Admission of Audiotape Recording
Next, the Defendant challenges the trial court's denial of his motion to exclude as evidence the audiotape recording he gave to Smith. While conceding that the audiotape included the facts and circumstances related to the murder, the Defendant contends that the tape should have been excluded because it referenced a prior domestic violence charge to which he pled guilty and was granted probation. He argues that the prejudicial effect of the prior offense, which would otherwise be inadmissible as evidence, outweighs the probative value of the remaining contents of the audiotape.

The admissibility of any evidence is governed in part by the general provisions as to relevance. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible and irrelevant evidence is not. Tenn. R. Evid. 402. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) governs the admissibility of evidence of a defendant's prior misconduct:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show action in conformity with the character
> trait. It may, however, be admissible for other purposes. The conditions

which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The terms of this rule establish that evidence of prior bad acts cannot be used to prove that a person has a propensity to commit a crime. Id.; State v. Adkisson, 899 S.W.2d 626, 645-46 (Tenn. Crim. App. 1994). Furthermore, in those instances where the prior conduct or acts are similar to the crimes on trial, the danger of unfair prejudice increases. State v. James, 81 S.W.3d 751, 762 (Tenn. 2002). Evidence of other crimes, wrongs, or acts may be admissible, however, when the prior conduct is relevant to an issue other than the accused's character, such as identity, motive, common scheme or plan, intent, or absence of mistake. State v. Gilliland, 22 S.W.3d 266, 271 & n.6 (Tenn. 2000); Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

When addressing the Defendant's motion to exclude the audiotape recording, the trial court followed the procedural requirements of Tennessee Rule of Evidence 404(b). During a hearing held outside the presence of the jury, the trial court found that while parts of the audiotape were difficult to understand, the statements made by the Defendant were relevant and probative of his state of mind and his motive for committing the crime of first degree murder. Further, the trial court found that the evidence of the prior act of domestic violence was clear and convincing, as described by the Defendant in his own words and, in consequence, there was "so much probative value [on the tape] and so little danger of unfair prejudice" that the tape, including the domestic violence reference, should be allowed into evidence.

Because the trial court adhered to the procedural requirements of Rule 404(b), our review is limited to whether the admission of the evidence qualified as an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); see also Gilliland, 22 S.W.3d at 270 ("[W]hen the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, then any decision as to whether to admit evidence under Rule 404(b) will only be reversed for an abuse of discretion."). "A court abuses its discretion when it applies an

incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012).

In our view, the trial court did not abuse its discretion by admitting the contents of the audiotape as evidence. Because the defense theory was that the Defendant's state of mind mitigated intent and precluded the element of premeditation, his recorded statements were highly probative and, in context, any prejudice resulting from the reference to his prior offense paled in comparison.

### D. Special Jury Instruction on Diminished Capacity

At the conclusion of the proof, the Defendant made a special request for an instruction on diminished capacity, presumably as it related to the issues of intent and premeditation. After finding that the proof related to the Defendant's use of Ambien did not establish that he suffered from a mental disease or defect, the trial court denied the request and instead charged the jury as follows:

The [S]tate must prove beyond a reasonable doubt the culpable mental state of the [Defendant]. Culpable mental state means the state of mind of the [Defendant] at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the [Defendant] at the time of the commission of the offense. The state of mind which the [S]tate must prove is contained in the elements of the offense as outlined in these instructions.

In this case, you have heard evidence that the [D]efendant might have suffered from a condition which could have affected his capacity to form the culpable mental state required to commit a particular offense.

If you find from the evidence that the [D]efendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the [D]efendant was at the time of the commission of the offense to determine of which, if any, offense he is guilty.

Although not entirely clear from the record, in his appeal to the Court of Criminal Appeals, the Defendant appears to have argued that the trial court erred by refusing to specifically use the term "diminished capacity" in its charge to the jury and instead giving instructions on "a condition which could have affected his capacity to form the culpable mental state."

-17-

Of course, diminished capacity is not a defense to a criminal charge, but evidence of diminished capacity is admissible to negate mens rea. See State v. Ferrell, 277 S.W.3d 372, 379 (Tenn. 2009) (citing State v. Hall, 958 S.W.2d 679, 690-91 (Tenn. 1997)). Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming a criminal intent by virtue of an impaired mental condition, such as voluntary intoxication. Tenn. Code Ann. § 39-11-503(a) (2010) ("[I]ntoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state."); Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006) ("Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense."); see also State v. Vaughn, 279 S.W.3d 584, 601-02 (Tenn. Crim. App. 2008) (concluding that expert testimony as to intoxication was relevant and admissible evidence in murder trial); State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992) ("Unquestionably, the defense of voluntary intoxication relies upon such a diminished capacity.").

To justify an instruction on diminished capacity, however, the proof must establish that any "inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." Hall, 958 S.W.2d at 690 (emphasis added) ("It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue."). The jury is tasked with evaluating the weight to be given the evidence and determining whether the voluntary intoxication negated the culpable mental elements. State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000); Vaughn, 279 S.W.3d at 602 ("The questions of whether the [d]efendant in this case was under the influence of PCP at the time of the offense, and if so, whether his intoxication had any bearing on his ability to premeditate and form the intent to kill, were questions appropriate for the jury's consideration."). Although the Defendant presented three expert witnesses to address the effects of the Ambien and the Defendant's vulnerability to the drug, the trial court concluded that the testimony did not demonstrate that he suffered from a mental disease or defect and declined to instruct the jury on diminished capacity. The Court of Criminal Appeals affirmed, holding that the trial court's charge to the jury was adequate under the proof. Adams, 2011 WL 4375332, at *15.

In general, the refusal to grant a special request for an instruction is error only when the standard charge, read in its entirety, fails to fully and fairly provide the applicable law. State v. Hanson, 279 S.W.3d 265, 280 (Tenn. 2009). The purpose of a special instruction is "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001), overruled on other grounds by State v. White, 362 S.W.3d 559 (Tenn. 2012). Only when there is a deficiency is relief warranted. In our assessment, the trial court

properly instructed the jury to consider all of the evidence regarding the ability of the Defendant to form the requisite intent. Because the instructions provided the jury with the opportunity to consider whether the Defendant's mental capacity may have been affected by his use of Ambien, the trial court did not err by refusing the special request to utilize the term "diminished capacity."

### E. Sufficiency of the Evidence

As his final issue, the Defendant argues that the evidence was insufficient for any jury to conclude beyond a reasonable doubt that the Defendant murdered the victim with premeditation and, therefore, that the evidence was insufficient to sustain a conviction of first degree murder.

Traditional principles apply to the appellate review of challenges to the sufficiency of the convicting evidence. A guilty verdict "shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). "When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." Hanson, 279 S.W.3d at 275 (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

A criminal offense may, of course, be established exclusively by circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). The jury must decide the significance of the circumstantial evidence as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (alteration in original) (quoting Marable, 313 S.W.2d at 457). Appellate courts may not substitute their own inferences for those drawn by factfinders in circumstantial evidence cases. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). In Dorantes, this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. 331 S.W.3d at 381. Our standard of review is, therefore, identical "whether the conviction is based upon direct or circumstantial evidence." Id. at 379 (quoting Hanson, 279

S.W.3d at 275) (internal quotation marks omitted).

First degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (2010). A premeditated killing is one done "after the exercise of reflection and judgment." Id. § 39-13-202(d). Further,

> "[p]remeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003).

> The following circumstances are relevant to a finding of premeditation:
>
> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and [the] defendant's calmness immediately after [the] killing.

Id.; see also State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). "These factors, however, are not exhaustive." Davidson, 121 S.W.3d at 615. Evidence establishing a motive for the killing and the nature of the killing are also factors from which the jury may infer premeditation. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). Specifically, evidence of repeated blows is a relevant factor in determining premeditation, although this evidence alone would not be sufficient to establish premeditation. State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001) (citing State v. Brown, 836 S.W.2d 530, 541-43 (Tenn. 1992); Banks, 564 S.W.2d at 950). Moreover, although the particular circumstances of each case will differ, stab wounds have been found to be more consistent with a premeditated killing than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun. See State v. Underwood, No. M2006-01826-CCA-R3-CD, 2008 WL 5169573, at *14 (Tenn. Crim. App. Dec. 10, 2008); see also State v. Reid, 164 S.W.3d 286, 311 (Tenn. 2005) (finding sufficient evidence to support premeditation where the victims suffered multiple, deep stab wounds inflicted

with a knife blade that was several inches long); State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000) (finding sufficient evidence to support premeditation where the victim was forcefully stabbed to death).

After considering the evidence in a light most favorable to the State, we must conclude that a rational jury could have found that the Defendant acted with premeditation in killing the victim. The Defendant had stated on an audiotape recording that if he discovered the victim was cheating on him, he would kill her. In fact, when the victim bluntly informed the Defendant of her infidelity, the Defendant brutally attacked the unarmed victim with repeated blows from his pocketknife. Although the details of the attack are not entirely clear, the circumstantial evidence suggests that the Defendant had armed himself with a folding knife, opened the blade, and forcefully stabbed the victim twenty-seven times, predominantly in the neck and chest—vital areas of her body. The Defendant then disposed of the body on a steep downward slope near a drainage ditch. The prior threat, the use of a knife, the number, severity, and location of the wounds, and the disposal of the body all tend to support the element of premeditation. In our view, the evidence was sufficient to support a verdict of first degree murder.

### III. Conclusion

Although the trial court erred by permitting the jury foreman to testify as to the effect of an improper outside influence upon the verdict, the error was harmless in context. Moreover, the State presented sufficient admissible evidence to rebut the presumption of prejudice that accompanies an improper communication with a juror. The trial court did not err with respect to the admission of evidence or its jury instructions, and the evidence was sufficient to convict the Defendant of first degree premeditated murder. The judgment of the Court of Criminal Appeals is, therefore, affirmed. It appearing that the Defendant is indigent, costs are taxed against the State.

_____
GARY R. WADE, CHIEF JUSTICE