# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. CALEB WAYNE DEHOOG

**Appeal from the Criminal Court for Madison County**
**No. 12-629      Roy B. Morgan, Jr., Judge**

**No. W2013-02110-CCA-R3-CD  - Filed December 2, 2014**

The defendant, Caleb Wayne DeHoog, was convicted by a Madison County Criminal Court jury of attempted aggravated burglary, a Class D felony; two counts of aggravated assault, Class C felonies; and one count of aggravated criminal trespass, a Class A misdemeanor. He was sentenced to three years for the attempted aggravated burglary, five years for each count of aggravated assault, and eleven months and twenty nine days for the aggravated criminal trespass. The court ordered that the sentences for the two aggravated assault convictions be served consecutively to each other but concurrently with the sentences on the other convictions, for an effective term of ten years. On appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's imposition of consecutive sentences. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Daniel J. Taylor, Jackson, Tennessee, for the appellant, Caleb Wayne Dehoog.

Herbert H. Slatery, III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for two counts of attempted aggravated burglary, two counts of aggravated assault, one count of aggravated criminal trespass, and one count of

unlawful carrying or possession of a weapon, arising out of his appearing at the back door of the victims' house late at night and brandishing a machete.[1]

## State's Proof

Steve McRae,[2] one of the victims, testified that he lived at 311 Harts Bridge Road in Madison County, Tennessee, with his wife, Amy McRae, and their nine-year-old daughter. On April 11, 2012, around 9:45 p.m., he and Amy were watching television in the living room when their dogs started barking and they heard the lawn furniture on their deck being moved. Steve went to check on their daughter, who was watching television in her parents' bedroom, and to retrieve his gun. He went to the back door of the house and looked around, but he did not see anything. He then went to the sliding glass door off the kitchen and stepped out onto the deck. As soon as he stepped outside, the defendant ran toward him wielding a machete over his head. Steve jumped back inside, closed the door, and locked it. The defendant grabbed the door handle and began jerking on the door, while hitting the glass with the machete.

Steve testified that he stepped back and told his wife to call 911. The defendant kept hitting the glass. Steve thought the defendant was going to make it into the house, so he shot at him through the glass door. Steve only fired his gun once, as it jammed after the first shot. He cleared the misfired cartridge and went outside. He looked around but did not see anyone. However, when he got to the other end of the deck, he saw the defendant lying on the ground on his stomach, moaning. Steve monitored the defendant from the deck until the police arrived.

Steve expressed that he was in fear for the lives of him and his family when he saw the defendant running toward him with a machete over his head. Even after he got back inside the house and locked the door, Steve was afraid that the defendant was going to come through the door after them. Steve said that he did not give the defendant permission to be on his property or try to enter his house.

On cross-examination, Steve recalled that, when the defendant came toward the sliding glass door, he was saying something that Steve could not understand and was making animal sounds "like a dog growling when he was coming towards you." He said that the

[1] On the day of trial, at the State's request, the trial court dismissed one count of attempted aggravated burglary and the count of unlawfully carrying or possession of a weapon.

[2] Because the victims share the same surname, we will refer to them by first name only at times for clarity. We mean no disrespect by this practice.

defendant did not appear to be impaired. However, Steve acknowledged that when asked at the preliminary hearing, "'Did he act like he was having mental issues or impaired,'" he responded, "'Impaired a little.'" On redirect, Steve stated that the defendant appeared to know what he was doing during the encounter. On re-cross examination, Steve agreed that the defendant's actions of trying to pull open the sliding glass door and the sounds he was making did not make any sense to him.

Amy McRae testified similarly to her husband. She recalled that the defendant pounded on the sliding glass door with "a large knife in his hand" and an "angry look on his face" as he jerked on the door handle. She said that she did not give the defendant permission to be on their property or attempt to enter their house. She relayed that she was "terrified" during the incident and felt "like something out of a horror movie, [with] that big knife and him banging and trying to get in my home." Amy said that their home was not located close to any neighbors and was down a long driveway from the road. On cross-examination, Amy recalled that the defendant appeared to be "growling or screaming or something of that nature" when he was on the other side of the sliding glass door.

Officer Richard Butler with the Jackson Police Department testified that he was dispatched to a burglary in progress on April 11, 2012, and, while en route, was informed that the suspect had been shot while "actively trying to get into" the victims' home. When the officer arrived, Steve pointed to his gun, which was lying on a chair, and told Officer Butler that the suspect was around the corner. Steve appeared frightened and nervous. Officer Butler walked around the corner and saw the defendant lying on the ground. The defendant tried to raise up, but groaned and fell back down to the ground. He had a large wound to his abdomen, and there was a machete lying beside him. Officer Butler maintained the scene and waited on other officers to arrive.

Officer David Evans with the Jackson Police Department testified that he responded to the scene to collect evidence. Officer Evans collected a machete, an unspent .22 caliber bullet, and a silver house key, all of which were "right in the proximity of where the suspect was lying on the sidewalk." Officer Evans described the machete as having a silver blade, approximately sixteen inches in length, with "a black handle woven, some type of basket weave or fiber woven into the handle." He explained the chain-of-custody for the machete.

Officer Amy Allen, an evidence technician with the Jackson Police Department, further explained the chain-of-custody for the machete, and it was admitted as an exhibit.

**Defendant's Proof**

Investigator Chris Chestnut with the Jackson Police Department testified that he was

-3-

the third officer to arrive on the scene the night of the incident. He saw the defendant lying on the ground, wounded. The defendant was "[m]oaning and groaning . . . [j]ust [making] a growling type of sound."

Aaron Tischman, a friend of the defendant, testified that in April 2012, he and the defendant were on a road trip with plans to go from North Carolina to California and then to Washington. Tischman said that he had money for gas and "a lot of canned food" for the trip. They were traveling in Tischman's car and had been on the road for four days before they arrived in Jackson, Tennessee. It was late at night when they stopped in Jackson, and they found what appeared to be a secluded place to camp out in the woods. Tischman said that he owned a machete, which they used to cut twigs off trees to build a fire. They built a fire, ate dinner, and started drinking.

Tischman testified that he and the defendant both drank until they were intoxicated. The defendant "was slurring his words and he was walking around kind of goofy and stuff, like -- I could just definitely tell he was drunk that night." Tischman said that they planned to stay in the woods all night and did not plan to break into someone's house or attack anyone. The last time Tischman saw his machete, it was on a seat in his car. Tischman recalled that he passed out in his car, and the defendant was still up sitting by the fire. When he woke up the next morning, Tischman did not see the defendant anywhere. He drove around for awhile and then returned to the site and waited, but he finally decided that the defendant was gone and not coming back. On cross-examination, Tischman said that he did not contact the police about the defendant's disappearance because he did not have a phone.

The defendant testified that he and Tischman left on a road trip together from Jacksonville, North Carolina, traveling on back roads and camping along the way in remote areas away from people. When they stopped on the night of the incident, they used the machete to chop twigs for firewood, ate dinner, and started drinking. The defendant could not recall how much he had to drink, explaining, "I guess I just got too drunk and don't remember." He said that he "felt pretty intoxicated sitting by the fire[.]" He recalled that Tischman was drinking also, but not as heavily as him. The last thing he remembered was sitting by the fire and Tischman sleeping in the car. The machete was behind him lying next to the tire of the car. The next thing he remembered was waking up in the hospital.

The defendant testified that he now vaguely remembered saying, "Please, sir, help," as well as "walking down a street with trees on [his] left and a field to [his] right, and . . . the pain of being shot." He presumed that he could not remember things because he drank too much alcohol that night. In the hospital, once he learned what had happened, he told the nurse to "[t]ell him I'm sorry."

-4-

The defendant testified that he had no recollection or explanation as to why he was at the victims' house that night and that he had no intent to break into their house or harm them. He claimed that he just wanted to go to bed and sleep that night and "wanted to get really drunk because sleeping in the car was pretty rough[.]"

Lauren Smith, a nurse at Jackson General Hospital, testified that she was the defendant's nurse while he was in the hospital. She recalled that, when the defendant woke up, he asked her why he was in the hospital, and she told him, "You were intoxicated and you tried to break into someone's house with a machete and you were shot." The defendant's toxicology report from when he was brought into the emergency room "showed that he was intoxicated." She stated that the reference range for alcohol intoxication on a toxicology report was different than what police use in the field, explaining that "[l]ess than 10 would be not intoxicated, and his came back 130[.]" She could not say what level of intoxication the defendant had, but he was "clearly intoxicated."

After the conclusion of the proof, the jury convicted the defendant, as charged, of attempted aggravated burglary, two counts of aggravated assault, and one count of aggravated criminal trespass.

Thereafter, the trial court conducted a sentencing hearing, at which the victims, Steve and Amy McRae, testified to the impact the incident had on their family. They said that they become alarmed anytime they hear a noise outside or hear their dogs bark.

Joe DeHoog, the defendant's father, testified that the defendant lived in Ontario, California, most of his life and had been living with him there since being released on bond. The defendant had been employed for the most part since his release and showed an interest in going into the family's dairy business. He met with a counselor for several months regarding his alcohol use. He had also been involved in a couple of building mission projects in Mexico since his release. DeHoog said that the defendant had a large support network at home.

DeHoog expressed his and the defendant's apology to the victims. He said that he did not believe the incident would have happened had alcohol not been involved and that the defendant's actions that night were not in line with his character. He asked that the judge see the defendant for other than "the worst 30 seconds of his life."

Joan Westra, the defendant's aunt, testified that she had been close to the defendant his whole life. In the last year, she and the defendant had talked about his wanting to go into the dairy business with his father. She said that the defendant's actions on the night of the incident were completely out of character for him, and the incident would not have happened

had alcohol not been involved. She asked that the court see beyond the "very brief terrible decision that was made at that moment."

In addition, it was noted at the hearing that there were others present in support of the defendant and that numerous character letters had been submitted on his behalf.

At the conclusion of the hearing, the trial court imposed a sentence of three years for the attempted aggravated burglary, five years for each count of aggravated assault, and eleven months and twenty-nine days for the aggravated criminal trespass. The court reached such sentences after enhancing based on: there being more than one victim involved and the defendant's possession of a deadly weapon, see Tenn. Code Ann. § 40-35-114(3) and (9); and mitigating based on: the defendant's young age, no prior criminal convictions, and apparent remorsefulness, see id. § 40-35-113(6) and (13). Determining that the defendant was an offender whose record of criminal activity was extensive and a dangerous offender, see id. § 40-35-115(2) and (4), the court ordered that the sentences for the two aggravated assault convictions be served consecutively to each other but concurrently with the sentences on the other convictions, for an effective term of ten years.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the evidence was insufficient because, at the time he committed the offenses, he was intoxicated to such a degree that his mental capacity was impaired.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in

favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In order to convict the defendant of attempted aggravated burglary, the jury had to find that the defendant attempted to enter the McRaes' home, without permission, and with the intention of committing an assault. Tenn. Code Ann. §§ 39-12-101; 39-14-403. In order to convict the defendant of aggravated assault, the jury had to find that the defendant intentionally or knowingly, by using or displaying a deadly weapon, caused Steve and Amy McRae to reasonably fear imminent bodily injury. Id. §§ 39-13-101(a)(2); 39-13-102(a)(1)(A)(I). In order to convict the defendant of aggravated criminal trespass, the jury had to find that the defendant entered or remained on the victims' property when "[t]he person knows the person does not have the property owner's effective consent to do so; and [t]he person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another[.]" Id. § 39-14-406(a)(1), (2).

On appeal, the defendant does not dispute that the offenses occurred; he only contends that his actions were not intentional or knowing due to his intoxication.

Voluntary intoxication is not a defense to prosecution, but "is admissible in evidence[] if it is relevant to negate a culpable mental state." Id. § 39-11-503(a); see Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006) ("Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense."). However, "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime . . .; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). "Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming a criminal intent by virtue of an impaired mental condition, such as voluntary intoxication."

State v. Adams, 405 S.W.3d 641, 660-61 (Tenn. 2013). The weight given to evidence of voluntary intoxication and the determination of whether the voluntary intoxication negated the culpable mental state are matters resolved by the jury. State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000).

There was testimony at trial concerning the defendant's drinking on the night of the incident. There was also testimony from the nurse who treated the defendant that his toxicology report returned a level indicating that he was "clearly intoxicated." However, the nurse did not specifically testify that the defendant was incapable of forming the requisite criminal intent due to his intoxication, and the court specifically determined that she was not qualified to give such an opinion. In the light most favorable to the State, the evidence showed that the defendant procured a machete from inside Aaron Tischman's car and bypassed other homes to reach the victims' home, which was isolated from neighbors, where he repeatedly tried to gain entry into the home while brandishing the machete.

The record shows that the jury was properly instructed on voluntary intoxication at trial. By its guilty verdict, the jury found that the defendant acted intentionally or knowingly when he committed the crimes and that his voluntary intoxication did not negate his specific intent. We will not second-guess the jury's determination and conclude that the defendant is not entitled to relief on this issue.

## II. Sentencing

The defendant also challenges the trial court's imposition of consecutive sentences.

The length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

Generally, challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. Bise, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that

reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

Additionally, the trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in the Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is an offender whose record of criminal activity is extensive, or the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(2), (4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence was necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). As to consecutive sentencing, our standard of review is abuse of discretion with a presumption of reasonableness. State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013).

In imposing consecutive sentences, the trial court ruled as follows:

[T]he [d]efendant is an offender whose criminal record is [extensive] . . . . The Court can under [State v. Oscar Joe] Garcia[, No. W2009-00592-CCA-R3-CD, 2010 WL 1172073 (Tenn. Crim. App. Mar. 29, 2010)] consider the [d]efendant's criminal record and can fairly consider those offenses in this particular docket number for which he has now been convicted, and that again . . . ranges from attempted aggravated burglary to the two aggravated assaults to the aggravated criminal trespass. That is [a] fair consideration under the statute.

. . . [T]he [d]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The Court notes the circumstances here indicates such, and the Court finds that's been established by a preponderance of the evidence looking to the entire record in this case, the evidence I heard at the trial through the testimony of the witnesses and the nature of the charges.

But the Court must go a step further if the Court is to consider consecutive sentencing based on that particular finding.

A, the circumstances surrounding the commission of the offense are aggravated. This is a situation where again a young child was in the home and the threat was high to human life. A family, a whole family, attacked but particularly a child at risk in that home.

The Court finds, too, B, that the confinement for an extended period of time is necessary to protect society from the [d]efendant's unwillingness to lead a productive life and the [d]efendant's resort to criminal activity in furtherance of an antisocial lifestyle.

The [d]efendant[,] the Court can fairly consider[,] left the military without permission. I'm not making a finding that he's been court martialed or anything else, but the proof is clear that he left the military without permission, and he was on the road for that reason heading across country with his friend, his friend having left him at the time this occurred.

The Court also finds it's been established by a preponderance of the evidence that the aggregate length of sentence reasonably reflects or relates to the offenses for which the [d]efendant stands convicted.

So those having been found by the Court, having been established under the facts of this case, the Court will consider consecutive sentencing[.]

Although the defendant is seemingly aware that the trial court imposed consecutive sentences on two bases, that he is an offender whose record of criminal activity is extensive and a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, see Tenn. Code Ann. § 40-35-115(b)(2), (4), he only disputes the trial court's findings on the additional factors pertinent to a determination that he is a dangerous offender. Specifically, the defendant argues that the aggregate sentence was not reasonably related to the severity of the offenses or necessary to protect the public from further criminal acts by him.

The trial court made the requisite findings in support of its conclusion that the defendant was a dangerous offender, and, in light of the presumption of reasonableness attendant the trial court's findings, there is support in the record for the trial court's determination. In any event, even if there was error in finding the defendant to be a dangerous offender, the court appropriately imposed consecutive sentencing upon finding

that the defendant had an extensive record of criminal activity given his present convictions. This court has repeatedly held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)); see, e.g., State v. Kyle Ronald Fencl, No. M2012-01265-CCA-R3-CD, 2013 WL 3976060, at *8 (Tenn. Crim. App. Aug. 5, 2013), perm. app. denied (Tenn. Nov. 13, 2013); State v. Darius Jones, No. W2010-01080-CCA-R3-CD, 2011 WL 2162986, at *3 (Tenn. Crim. App. May 26, 2011), perm. app. denied (Tenn. Sept. 21, 2011); State v. Mark Robert Carter, No. M2007-02706-CCA-R3-CD, 2009 WL 1349206, at *10 (Tenn. Crim. App. May 14, 2009), perm. app. denied (Tenn. Sept. 28, 2009). A trial court may impose consecutive sentencing after finding any one of the criteria in Tennessee Code Annotated section 40-35-115(b). The trial court did not abuse its discretion in imposing consecutive sentences in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-