IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2021 Session

## NEHAD SOBHI ABDELNABI v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 114708   Steven Wayne Sword, Judge
————————————————————

**No. E2020-01270-CCA-R3-PC**
————————————————————

Petitioner, Nehad Sobhi Abdelnabi, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claim that he was denied a trial by an impartial jury and in dismissing his second amended petition claiming that trial counsel was ineffective in failing to convey a plea offer.  After hearing oral arguments and following a review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT and D. KELLY THOMAS, JR., JJ., joined.

Gregory P. Isaacs, J. Franklin Ammons, Knoxville, Tennessee, for the appellant, Nehad Sobhi Abdelnabi.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Petitioner was charged with two counts of especially aggravated kidnapping, two counts of aggravated assault, and one count of aggravated burglary.  His first trial resulted in a mistrial when his co-defendant, Lowi Fathi Akila referred to a previous incident where Petitioner allegedly threatened another man with a gun.  At the second trial, the jury convicted Petitioner of the lesser included offense of aggravated kidnapping in count one,

especially aggravated kidnapping in count two, and aggravated assault in counts three and four. The jury found Petitioner not guilty of aggravated burglary as charged in count five. The trial court merged count one into count two and merged count four into count three and ran the sentences concurrently for a total effective sentence of seventeen years in the Tennessee Department of Correction at 100% by operation of law. This court affirmed Petitioner's convictions, and the supreme court denied his application for permission to appeal. *State v. Nehad Sobhi Abdelnabi*, No. E2017-00237-CCA-R3-CD, 2018 WL 3148003 (Tenn. Crim. App., at Knoxville, June 26, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018).

The evidence presented at trial showed that Petitioner suspected Naser Ferwanah, who Petitioner knew from high school in Palestine, of having an affair with Petitioner's wife.[1] Mr. Ferwanah had visited Petitioner and his family and had visited Petitioner at his place of business, Electronics Tech about once per month. Petitioner at one point asked Mr. Ferwanah to swear on his Quran in the presence of his oldest son that he was not having an affair with Petitioner's wife. He was suspicious based upon a pornographic video he had seen of two individuals he thought looked like his wife and Mr. Ferwanah.

Petitioner and Mr. Ferwanah then began having dinner periodically with one of Petitioner's employees, Lowi Akila. On February 1, 2012, Mr. Ferwanah drove to Petitioner's place of business to meet with them for dinner. Petitioner asked Mr. Ferwanah to come into the store stating that he wanted to show him how someone who was tied up could get untied. Petitioner locked the door and tied both Mr. Ferwanah and Mr. Akila to wooden chairs and taped Mr. Ferwanah's chest and legs to the chair. Petitioner released Mr. Akila, and a masked man came in and threw Mr. Ferwanah, still tied to the chair, onto the concrete floor. After the chair broke, the masked man tied Mr. Ferwanah's hands behind his back with a zip tie and hit him with a baseball bat and a "two-by-four", and kicked him. Petitioner told Mr. Ferwanah he would let him go if he gave him the tapes. Mr. Ferwanah replied that he did not have any tapes. Mr. Akila and Petitioner continued assaulting Mr. Ferwanah and opened and closed a gun to show him it was loaded, then pointed it at Mr. Ferwanah's head. The masked man held a gun to Mr. Ferwanah's head and told him he would kill his wife and children if he told the police about the offenses.

Petitioner ultimately cleaned Mr. Ferwanah up, put him in the passenger seat of Mr. Ferwanah's vehicle and drove him to Mr. Ferwanah's home where Petitioner helped give him a bath and put him into bed, telling Mr. Ferwanah's wife that he had been in an accident. Eventually, after Petitioner left, Mr. Ferwanah's wife called 911, and he was taken by ambulance to a hospital. He sustained fractures in his left ankle, right wrist and

---

[1] These facts were derived from this court's opinion on direct appeal. *Nehad Sobhi Abdelnabi*, 2018 WL 3148003, at *1-6.

- 2 -

left wrist, and bruising and lacerations on his body as well as an injury to his head. He was out of work for four and a half months.

Petitioner's wife testified that she had never had an affair with Mr. Ferwanah. At the time of trial, she and Petitioner were in the process of a divorce. Knoxville Police Department officers who investigated the assault testified at trial, noting that during their investigation, the garage area of Petitioner's building was very clean and had a strong smell of cleaner. They also noticed a bucket with bloody blankets and blood on some of the tools. Officers also recovered a blue blanket, large plastic sheet and pieces of a broken chair from a dumpster at an apartment complex in west Knoxville. One of Petitioner's employees also testified about the strong smell of bleach when he walked into the business the next day and noticed that the floor was very clean.

Mr. Akila pled guilty to accessory after the fact and testified at trial describing the assault and admitting that he helped Petitioner clean up the garage area after the assault. He put the tarp, towels and broken chair in a dumpster at a nearby apartment complex. Petitioner called several witnesses at trial who testified about his good reputation and character.

*Post-Conviction Proceedings*

The record shows that Petitioner, through counsel, filed a timely petition for post-conviction relief on January 25, 2019, alleging the following grounds for relief:

> Pursuant to *Strickland v. Washington,* 466 U.S. 668 (1984), Ineffective assistance of counsel was provided to the Petitioner in violation of his 6th Amendment right to assistance of counsel.
>
> Counsel's performance fell below an objective standard of reasonableness.
>
> Counsel's performance gives rise to a reasonable probability that if counsel had performed adequately, the result would have been different.
>
> Counsel failed to adequately explore and present certain evidence of the affirmative defense of duress.
>
> The conviction was based upon the unconstitutional failure of the Government to disclose to [Petitioner] evidence that would be favorable to the defense.

Conviction was based upon a violation of protections against double jeopardy.

The conviction was based on inadmissible evidence.

That trial counsel has failed to include these matters in [Petitioner's] direct appeal, as such amend (sic) in the alternative Petitioner respectfully requests that he be granted a delayed appeal on these and any matter that were not included in any original direct appeals.

The original petition was not verified under oath by Petitioner or certified by counsel. *See* T.C.A. § 40-30-104(d); Tenn. R. Sup. Ct. R. 28, § 6(C)(3).

On February 5, 2019, the post-conviction court entered a preliminary order directing the State to respond within sixty days of its order, or sixty days of any amendment filed by Petitioner. As the post-conviction court later acknowledged, the preliminary order did not set a deadline for Petitioner to file an amendment or a notice that no amendment would be filed. Instead, the post-conviction court held that it would determine whether Petitioner was entitled to an evidentiary hearing once the State filed its answer or "after the expiration" of the sixty-day deadline "if no answer is filed." And "[i]f an evidentiary hearing is warranted," the court indicated that it would place the case on its docket for May 16, 2019.

On February 9, 2019, the State filed an answer denying the allegations in general and demanding strict proof. In its answer, the State did not object to the lack of verification of the original petition. The parties agreed to continue the matter to July 18, 2019, and then agreed to continue the hearing to September 19, 2019. On September 11, 2019, Petitioner filed a first amended post-conviction petition incorporating the same issues he raised in the original petition and adding one new claim of juror misconduct. Unlike the claims he raised in his original petition, Petitioner provided lengthy factual allegations for the juror misconduct claim and alleged that he uncovered evidence of juror misconduct during "post-trial investigation." The first amended petition was not verified under oath and was not certified by counsel.

The case was again continued by agreement of the parties to November 21, 2019. Three days before the hearing, the State filed its answer to the first amended petition denying the allegations in general, demanding strict proof, and objecting to the jury misconduct claim on the grounds that post-conviction relief is not the proper remedy for newly discovered evidence. The State did not object to the petition for lack of verification or certification in its answer.

- 4 -

On the morning of the hearing, November 21, 2019, Petitioner filed a second amended petition verified under oath, incorporating the claims raised in the original petition and the first amended petition, and alleging for the first time that his trial counsel was ineffective for failing to communicate a plea offer from the Assistant District Attorney General of ten years as a Range I Offender. Attached to the second amended petition was a verification under oath by Petitioner dated September 17, 2019, the date of the first amended petition.

Although two witnesses were present at the hearing on November 21, 2019, they did not testify and only arguments of the parties were heard regarding the sufficiency of the petition and amended petitions. The post-conviction court observed that Petitioner had filed a second amended petition that morning. The State objected to the amended petition and second amended petition despite not raising such objection in its answers. The State conceded that it had filed a "boilerplate reply to avoid the risk of having violated" the statute requiring the State to answer the petition. In terms of the time to investigate Petitioner's claims, the State averred that Petitioner had a full year from the final judgment to investigate all claims before filing the petition and therefore could have included the juror misconduct claim in the original petition. The State added that the only way the post-conviction court could consider the amended petitions were if the court construed the amended petitions as "new petitions."

Post-conviction counsel argued that, "[t]here's no way we could have known about this juror issue raised in the first amended petition until we were able to track down who the jurors were."

The State argued that neither the original petition nor the first amended petition was verified under oath by Petitioner and cited *Hutchison v. State*.[2] The State argued that the original petition did not include allegations of fact supporting each claim and therefore failed "to survive preliminary consideration." As for the first amended petition, the State argued that the juror misconduct issue was waived because it was an issue that could have been raised on direct appeal. The State argued further that the juror misconduct issue did not withstand waiver even if proof of the misconduct was newly discovered.

In response to the State's argument, post-conviction counsel advised the "new [prosecutor] to speak to the deputies . . . in his office" because the parties discussed "in

---

[2] Although no citation is given, it appears the State may have been referring to *Leonard D. Hutchinson v. State,* No. 03C01-9101CR5, 1991 WL 105269, *1 (Tenn. Crim. App., June 19, 1991) (post-conviction court properly dismissed petitioner's post-conviction petition without a hearing where petitioner filed a second post-conviction petition to review this court's judgment affirming the denial of the first post-conviction petition).

detail" Petitioner's claims before Petitioner filed the amended petitions "as a courtesy to the state[.]" Post-conviction counsel stated that he did not want to raise anything in a petition or amended petition that he could not "absolutely verify positively."

On November 22, 2019, the post-conviction court entered a preliminary order dismissing the original petition and the second amended petition finding that the claims in the original petition lacked supporting factual allegations as required under the statute although it was prepared with the assistance of counsel. The court held that the remaining claims alleging a *Brady* violation, double jeopardy violation, and the admission of inadmissible evidence, were waived. The post-conviction court held that good cause did not excuse the untimely filing of the second amended petition because allegations regarding a plea offer "were certainly known to the petitioner from the beginning of the case." The post-conviction court withheld judgment on whether to go forward on the first amended petition and scheduled another hearing to determine whether the delay in filing the first amended petition was excused by good cause.

The hearing on the first amended petition was held December 12, 2019. No evidence was presented. The post-conviction court first addressed Petitioner directly about the purpose of the hearing and noted that the petition "still has not been sworn to under oath as required by statute" but would permit "an amended swearing to that." The post-conviction court asked post-conviction counsel to "offer an explanation as to the lateness of the filing" of the first amended petition.

To that end, post-conviction counsel explained that he had been retained in February 2019 and filed the original petition after discussing the case with Petitioner. Afterwards, post-conviction counsel secured the funds for an investigator but could not begin investigating the case due to a three-to-four-month delay in getting the trial transcripts and trial counsel's case files. Post-conviction counsel began investigating the case in April or early May of 2019. He "immediately noticed a familiar name" among the jury panel: Kuhlman. He also recognized a sheriff's deputy but focused his attention on Kuhlman. The investigator began talking to the jurors by using the jury list. Post-conviction counsel amended the petition upon receiving a report from the investigator. Post-conviction counsel added that he corresponded weekly with the former prosecutor on the case about the juror bias issue before "putting something on paper[.]" He characterized the discussions as "sort of a gentleman's agreement."

The post-conviction court found that Petitioner's delay in filing the first amended petition was excused by good cause:

- 6 -

So at this point I think the Court is going to find good cause for delay in filing that first amended petition due to their further investigation with the jurors and discussions with the former prosecutor.

The post-conviction court allowed Petitioner to cure the petition by having Petitioner verify it under oath. The post-conviction court addressed how the proceeding would move forward on the juror bias issue only:

So here's what we're going to do, . . . The allegations concerning juror misconduct are very concerning. If that is true, then the burden shifts to the state to show that you were not prejudiced by that juror misconduct.

Now, the state needs to investigate that to determine whether or not they think there actually was juror misconduct or not, and if so, then we have to explore if you are prejudiced by that misconduct. And so I'm going to continue this case once again to give the state some time to look into it. But I'm going to set it for a hearing on that issue of juror misconduct.

Evidentiary Hearing – August 7, 2020

McCalla Hope Roberts testified that she served as a juror in Petitioner's second trial in 2016. At the time, she was married to Russell Kuhlman and went by the name of McCalla Kuhlman. They later divorced. The transcript of the voir dire reflects that she was juror number six ("Juror 6").

Juror 6 testified that she did not personally know the prosecutor, Kevin Allen ("prosecutor") but knew of his wife, Charme P. Allen, as a volunteer for Republican campaigns in Knox County. Charme Allen ("DA") was running for Knox County District Attorney at the time of trial. Juror 6 denied that she worked directly with the DA on her campaign or knew her personally. Juror 6 indicated that she may have posted signs for the DA because she posted signs for all candidates. She recalled seeing the prosecutor and the DA at a Republican party kickoff but denied waving at the prosecutor or making faces at him during trial.

Juror 6 did not recall telling the defense investigator that she "wanted to be on the jury [of Petitioner's trial]" but agreed that she "wanted to be on the jury to fulfill her civic duty." She testified that she did not know Petitioner or anything about the case, nor was she aware about an earlier trial and anything about a gun. She remembered being asked many questions by the attorneys and the judge during voir dire. Juror 6 did not recall being asked whether anyone in the panel had been a victim of a crime in general or domestic violence in particular.

Juror 6 knew of Salon Visage, a hair salon. She denied that her sister worked there. She also denied telling the investigator that she knew a Persian lady named "Leeann" who worked at Salon Visage. Juror 6 stated that she knew "many people named Leeann" but denied that she ever went to Salon Visage.

Juror 6 denied holding the view that Muslim men abused their wives. She also denied calling Petitioner a variety of Islamophobic names such as "towel head" or "abugabi." She denied that she gathered socially with her fellow jurors or sent other jurors text messages at night about the case during the trial. She maintained that she met the jurors socially after the trial had finished and only talked to the other jurors about the case during trial "in the room."

Juror 6 admitted that she was "intimidated" and "a little scared" about testifying at the post-conviction hearing. She denied that she researched the facts about the case through means other than the evidence presented at trial. When queried by the post-conviction court, Juror 6 maintained that she had not researched the facts or the law using her smartphone and denied telling the prosecutor that she had done so:

| The Court: | Did you tell [the prosecutor], over here, at any point, that during the trial you researched the facts of this case or the law? |
| --- | --- |
| Juror 6: | I think the wording that I used with him is that's something that I could have done. |
| The Court: | Could have. You mean, maybe it happened, but you don't remember? Or could have, that you had the capability of it, but you didn't do it. |
| Juror 6: | I don't remember doing it. |

Russell Briscoe Kuhlman, Jr. was married to Juror 6 at the time of the trial in 2016 and confirmed that their divorce had become final before the post-conviction hearing. The State objected to statements Juror 6 allegedly made to Mr. Kuhlman as hearsay. The post-conviction court overruled the objection and held that Mr. Kuhlman's testimony would not be offered to prove the truth of the matter asserted but rather as impeachment evidence.

According to Mr. Kuhlman, Juror 6 referred to Petitioner using derogatory slurs such as "abugabi" and "towel head"; that she believed that Muslim women lacked the right to drive, and could not hold a job; that she and the prosecutor's spouse, the DA, were

friends and she had helped set up a table for the DA at a political event; and that she waved to the prosecutor when the trial began and would make fun of him to the DA during a lunch break. Mr. Kuhlman did not believe Juror 6 had been to the prosecutor's home. He added that Juror 6 socialized with the fellow jurors outside of court during the trial and would send text messages about the trial outside the courtroom.

Mr. Kuhlman testified that Juror 6 was fearful of being abused by the man she was married to before him, a marine. According to Mr. Kuhlman, Juror 6 "spent her marriage hiding in a closet" because she was "afraid of being abused by [the marine]." Mr. Kuhlman testified that he witnessed the ex-husband try to punch Juror 6 when Mr. Kuhlman came along to pick up Juror 6's belongings from her former home.

Mr. Kuhlman did not hear Juror 6 say anything about an earlier trial involving Petitioner but recalled her mention a gun. Mr. Kuhlman testified that Juror 6 was "very fascinated with the trial" and "look[ed] up the laws" on her phone. He stated that Juror 6 had him drive by Petitioner's place of business. Mr. Kuhlman remembered driving by because Mr. Kuhlman had gone there before to have his car remote repaired. Mr. Kuhlman stated that Juror 6's sister was a hairstylist at Salon Visage and that Petitioner's wife was a regular customer there.

On cross-examination, Mr. Kuhlman testified that he used to work at the Knox County Sheriff's Office and was familiar with court procedure and was aware that it is a felony to lie under oath. Mr. Kuhlman revealed that post-conviction counsel represented him when he was arrested for public intoxication and disorderly conduct in 2005 when Mr. Kuhlman was twenty-one years old.

Mr. Kuhlman testified that "most of" what Juror 6 said about the trial occurred during the trial including the comment about a gun. Juror 6 did not tell Mr. Kuhlman that she failed to talk about her marriage to the marine during voir dire. Mr. Kuhlman was not with Juror 6 when she reportedly socialized with her fellow jurors. He did not read the text messages purportedly sent to fellow jurors. When asked why he did not report what he observed, Mr. Kuhlman replied that he "didn't know the jury had been sequestered" or instructed not to talk about the case.

Mr. Kuhlman told Petitioner's investigator what he had heard from Juror 6 about the trial. The interview with the investigator occurred in May 2019. Mr. Kuhlman explained that the investigator called him in an attempt to contact Juror 6 about Petitioner. Mr. Kuhlman had known the investigator "for a long time." The investigator "apologized" to Mr. Kuhlman because he heard a rumor that Juror 6 had an affair during the marriage.

Mr. Kuhlman confirmed that he and Juror 6 have a child together. Juror 6 filed for divorce in 2018. The divorce was granted in February 2019. Although the divorce was final, Juror 6 sought child support. When asked whether he was aware of an order for child support issued on October 10, 2019, Mr. Kuhlman testified that he and Juror 6 had agreed on the issue of child support and the only thing that changed by the October order was that child support would be withdrawn from his paycheck.

On redirect examination, Mr. Kuhlman insisted that he was "not trying to get back at anybody." He clarified that the amount of the child support remained the same despite the court order and denied that it was the subject of protracted litigation between himself and Juror 6. He explained that child support payments would be paid through the court instead of directly to Juror 6.

Nathalie Walker, a private investigator, testified that she was retained by the defense and interviewed Juror 6 on May 29, 2019. The State objected to Ms. Walker's testimony on the same grounds as Mr. Kuhlman's testimony. The post-conviction court likewise permitted Ms. Walker to testify, not as substantive evidence but for purposes of impeachment.

According to Ms. Walker, Juror 6 indicated that she was "very excited to be on the jury." Ms. Walker did not ask Juror 6 whether she had ever been the victim of a crime. Juror 6 relayed to Ms. Walker that she did not know anyone on the jury before the trial. Juror 6 had become friends with two jurors, Leann Shedden and Marshall Goldman. The voir dire transcript shows that Marshall Goldman was seated as Juror 12 and Leann Shedden was seated as the first alternate, Juror 13. Juror 6 referred to Juror 13 as "the Persian woman." Juror 6 indicated that she had known the DA, the prosecutor's spouse, but did not disclose this information during voir dire because she did not think it was relevant to the case and added that she was "not scared" of the DA. Juror 6 did not put together that the prosecutor and the DA were married until the prosecutor gave his name at the beginning of the trial. Juror 6 told Ms. Walker that she approached the prosecutor after the trial and asked him whether he knew that she sat on the jury. He replied that he had not known. The State chose not to cross-examine Ms. Walker.

Voir Dire – January 25, 2016

The summary of the voir dire will be limited to the facts surrounding Petitioner's claim that Juror 6 failed to disclose her relationship with the prosecutor's wife, the DA, her prejudicial view of Muslim men, and her experience as a domestic violence victim.

The transcript of the voir dire was made an exhibit to the record and revealed that Juror 6 was in the first panel of eighteen prospective jurors called to the jury box. The trial

judge, who was also the judge of the post-conviction proceeding, informed the panel before administering the oath, that the questions they would be asked "are real easy to answer. There are no right or wrong answers." The trial court also assured the panel that the purpose of the questions was not to "judge" but to "select the most appropriate jurors for this case." To that end, the trial court further advised the panel that they "c[ould] not allow bias or prejudice or sympathy or anything except the law and the evidence to play a role in that decision[-]making process."

The trial court introduced the attorneys for each side and identified the prosecutor by name. None of the jurors indicated that they knew Petitioner, his business, Electronics Tech, his two attorneys, or the facts of the case. One prospective juror, Juror 9, indicated however, that he knew the prosecutor because his son played basketball with the prosecutor's stepson. Juror 9 testified that he did not have a personal relationship with the prosecutor and his prior knowledge of the prosecutor would not affect his ability to be fair and impartial. Later, in a bench conference held in the presence of the jurors but out of their hearing, the defense initially declined to challenge Juror 9 for cause based on his testimony about his son's playing basketball with the prosecutor's son. This changed when the prosecutor revealed that his son had invited friends from the basketball team for an overnight gathering including Juror 9's son. Although the trial court found Juror 9's testimony about being impartial to be credible, the trial court granted the defense challenge to move Juror 9 for cause out of an abundance of caution.

After Juror 9's removal, the defense asked the panel whether anyone had "heard, read, seen[,] involved with any other cases that [the prosecutor], or his wife, Charme Allen, is the D.A., have been involved with or interested in?" No one replied that they had including Juror 6 who remained silent.

After the trial court concluded its general questioning, the attorneys for each side posed their own questions. The prosecutor provided the ethnic background and religion of the victim and Petitioner and asked whether the panel could remain fair and impartial:

> The . . . victim in this case immigrated here from Palestine, the Gaza Strip, and [Petitioner] too, lawfully. Both here in this country lawfully. But is nonetheless an immigrant into the United States, and I worry, obviously, when I see on the news inflammatory things about immigration.
>
> Does anybody here have anything in their background that they would feel that that would cause them concern or pause or anything of that nature?
>
> Okay. How about with regard to Israel and Israel Palestinian conflicts . . . throughout history? Does anybody have anything in their background that

would cause you – both men are from Palestine, the Gaza Strip, Israel, or what's known as Palestine. Anybody have anything in their background that would cause them concern about that?

(Prospective jurors indicated in the negative.)

Correct, 'cause the law applies equally to everybody, right? And so that's the point I guess I'll get to. The judge instructs you no sympathy, no prejudice, and those types of things. Obviously, their immigration status and their ethnic – ethnicity, and the fact that . . . both men are Islamic – or Muslim, should – does that weigh in any way on the way you might view the facts and evidence in the case?

(Prospective jurors indicated in the negative.)

Next, the prosecutor asked whether anyone had experienced "a significantly traumatic event where you've been beaten pretty seriously, anybody?" Once again, the jurors, including Juror 6, collectively answered in the negative.

The first time Juror 6 is identified in the transcript is when she is asked by defense counsel whether she agrees with another juror that a person "become[s] more cautious" when once betrayed. And later, when asked to identify what they are watching on television, Juror 6 replied, "Scandal."

In the third round, the State again asked the venire whether anyone has "a strong view about immigration where you feel like somebody who immigrated in (sic) this country would deserve less protection than anybody else?" The State asked more pointedly whether anyone would "hold it against . . . the victim or [Petitioner] in this case, because of their religion?" The prospective jurors collectively answered in the negative. When the State asked whether the venire could "take the oath" and decide the case based on the evidence and listening to the testimony, they all answered in the affirmative.

Before taking a break for lunch, the trial court gave an initial admonishment to the entire panel which would be applicable throughout the trial of the case should they be selected to sit on the jury and stated repeatedly, namely, that they were not to discuss the case with each other or anyone else.

- 12 -

Following the recess for lunch, the prosecutor asked the following catch-all question for the first time:

> Is there anything in your background that you think that you would not be able to sit fairly, listen to the evidence, and – and render a just and fair verdict without sympathy or prejudice in this case?  Is there anything I failed to ask or do or say that would cause you to say, "Hey, you might want to know this about me?"  Anybody?

Because all the prospective jurors replied in the negative, the State concluded its questioning for that round.

The defense continued with the theme of the State's last question and encouraged the venire to speak up if necessary:

> So if there is anything during any of these questions, either this round or next round, if we have it, that you think that we need to know, please just raise your hand, and we'll talk to you a little further about it, or if it's something that needs to be said not in front of everybody here in the courtroom, then the judge may allow you to say it – because he controls that part of the courtroom, allow you to say it in private so that no one else can hear if you think that it's important enough and most things are.

The transcript reflects that no one alerted the prosecutor, the defense attorneys, or the trial court of needing to speak privately or otherwise during voir dire in response to the defense's encouragement to do so.

The State again asked a variation of its earlier question during the final round of voir dire:

> In terms of the voir dire as it went, in terms of the questions I asked the previous panels, was there anything that you – caused you alarm and said, "Oh well, if I was up there, I'd have to answer this question," or "I'd want them to know about this with regard to that issue"?  Was there anything that caused you – any one of you to – concerned about something based on your – an experience that you've had that the state should know about?  Anybody?

The panel replied in the negative, and the State shortly thereafter, concluded its voir dire.

**Analysis**

I. **Dismissal of Colorable Claim in Late-Filed Second Amended Post-Conviction Petition.**

Before we address the merits of Petitioner's claim, we must first address whether the post-conviction court erred in dismissing Petitioner's second amended post-conviction petition which included the specific factual allegation of ineffective assistance of trial counsel for failure to convey a settlement offer. Petitioner contends that the delay in filing the second amended post-conviction petition was excused by good cause. He alleges that the post-conviction court "never set a deadline" for him to file an amended petition, that the delay in filing the second amended petition was due to a three-month delay in obtaining trial counsel's case file and the difficulty in meeting and conferring with counsel while Petitioner was incarcerated. Petitioner insists that he remained diligent in investigating the case while waiting for the case file from trial counsel by securing the funds for an investigator. Petitioner adds that dismissing the second amended petition deprived him of the opportunity to challenge trial counsel's performance contrary to due process. The State argues that the post-conviction court properly dismissed the second amended petition because Petitioner's reasons for the delayed filing amounted to the "regular course of business," and not good cause.

Because the late filing of the second amended petition was not excused by good cause as contemplated by the Post-Conviction Procedure Act, the post-conviction court properly dismissed its claim including the claim of ineffective assistance of trial counsel.

Post-conviction relief is "entirely a creature of statute[.]" *Holland v. State,* 610 S.W.3d 450, 457 (Tenn. 2020) (quoting *Bush v. State,* 428 S.W.3d 1, 15 (Tenn. 2014)). That statute, the Post-Conviction Procedure Act ("the Act"), details the process which precedes the post-conviction court's grant of an evidentiary hearing. *See Burnett v. State,* 92 S.W.3d 403, 406-27 (Tenn. 2002) (supreme court's outline of three stages of a post-conviction court's review process under the 1995 Act). A post-conviction proceeding commences with the filing of a petition which "shall include all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all the claims are included." T.C.A. § 40-30-104(a), (d). Simply claiming that a constitutional right has been violated is insufficient to warrant "further proceedings. *Id.* § 40-30-106(d). The same holds true for "mere conclusions of law." *Id.* The consequence of failing to support all claims with factual allegations is "immediate dismissal." *Id.* § 40-30-106(d). Indeed, the petition "shall include allegations of fact supporting each claim for relief[.]" *Id.* § 40-30-104(e). The Act requires a petition that is "complete" as set forth below:

The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings. Failure to state a factual basis for the grounds alleged shall result in immediate dismissal of the petition.

*Id.* § 40-30-106(d). Thus, the Act affords the post-conviction court with the authority to dismiss a petition without a hearing where the petition fails to state a factual basis for the grounds alleged. *Id.*

If a petition is "incomplete" and the petitioner is pro se, the post-conviction court may eschew "immediate dismissal" and give the pro se petitioner fifteen days to file a petition that complies with the Act or suffer dismissal of the petition. *Id.* § 40-30-106(d) ("[i]f, however, the petition was filed pro se, the judge may enter an order stating that the petitioner must file an amended petition that complies with this section within fifteen (15) days or the petition will be dismissed"). If the pro se petitioner files an amended petition that still remains "incomplete," the post-conviction court may dismiss the petition, or, determine whether the petitioner is indigent, appoint counsel, and order counsel to file a "complete petition" within thirty days of the appointment. *Id.* § 40-30-106(e).

Once the post-conviction court receives a "complete petition" or an "amended petition," the post-conviction court must then determine whether the petitioner asserts a colorable claim:

Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed.

*Id.* § 40-30-106(f); *Burnett,* 92 S.W.3d at 406 (citing T.C.A. § 40-30-206(f) (1997) renumbered to § 40-30-106(f) in 2003); *see also* Tenn. Sup. Ct. R. 28, §2(H) (definition of a colorable claim).

The amendment of a petition is not wholly dependent on whether a petitioner is pro se or represented by counsel. Rather, the situation depends on whether a petition survives preliminary dismissal under Tennessee Code Annotated section 40-30-106 as previously examined. *See id.* § 40-30-107(a) ("[i]f the petition is not dismissed upon preliminary consideration, the court shall enter a preliminary order"). Should a petitioner decide to file

- 15 -

an amended petition, one must be filed within thirty days of the entry of the post-conviction court's preliminary order:

> *If counsel is appointed or retained, or the petitioner is proceeding pro se,* counsel or the petitioner if proceeding pro se must file an amended petition or a written notice that no amendment will be filed. The amended petition or notice shall be filed within thirty (30) days of the entry of the preliminary order, unless extended for good cause. The written notice, if filed by counsel, shall state that counsel has consulted the petitioner and that the petitioner agrees there is no need to amend the petition. Good cause will not be met by a routine statement that the press of other business prevents the filing of the appropriate pleadings within the designated time.

*Id.* § 40-30-107(b)(2) (emphasis added). The time for filing an amended petition may be extended but only for "good cause." *Id.* § 40-30-107(b)(2). "Good cause will not be met by a routine statement that the press of other business prevents the filing of the appropriate pleadings within the designated time." *Id.*

The petitioner bears the affirmative duty of informing the court and the State if an amended petition will not be filed. *Id.* "If, after consulting with the petitioner, counsel declines to amend the petition, written notice that an amended petition will not be filed must be provided to the court." *Burnett*, 92 S.W.3d at 407 (citing T.C.A. § 40-30-207(b)(2) (1997) (renumbered to § 40-30-107(b)(2) in 2003). This is important because under the Act, the State is given a generic thirty days to respond. *Id.* § 40-30-108(a) ("The district attorney general shall represent the state and file an answer or other responsive pleading within thirty (30) days, unless extended for good cause"). Once the State has filed its response, the post-conviction court engages in its final review before determining whether to hold a hearing:

> The court shall review the case after the district attorney general's response is filed. If, on reviewing the petition, the response, files, and records, the court determines conclusively that the petitioner is entitled to no relief, the court shall dismiss the petition. The order of dismissal shall set forth the court's conclusions of law. If the court does not dismiss the petition, the court shall enter an order setting an evidentiary hearing. The order of dismissal or the order setting an evidentiary hearing shall be entered no later than thirty (30) days after the filing of the state's response.

*Id.* 40-30-109(a) (statute entitled "prehearing procedure"). The Act contemplates a situation where the post-conviction court dismisses a petition without a hearing even after

a petition has "survived earlier dismissal." *See Burnett*, 92 S.W.3d at 407 (citing T.C.A. § 40-30-209(a) (1997) renumbered to § 40-30-109(a) in 2003).

The post-conviction court's dismissal of a petition is a question of law which this court reviews de novo with no presumption of correctness. *Burnett*, 92 S.W.3d at 406 (citing *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001)).

In dismissing the second amended petition in this case, the post-conviction court acknowledged that no deadline for any amendment was stated in the February 5, 2019 preliminary order but found that both the first amended petition and the second amended petition were filed more than 200 days after the court's preliminary order and therefore well beyond the thirty-day requirement under the Act:

> The court did not dismiss the petition upon preliminary consideration. Although the court did not set a deadline for amendments, the statute says that they "shall be filed within 30 days of the [entry] of the preliminary order.["] Yet, the first amendment was not filed until 215 days after the preliminary order. The 2nd amendment was not made until 287 days after the preliminary order.

The post-conviction court held that good cause did not excuse the delay in filing the second amended petition:

> The court has wide discretion in allowing amendments to petitions. The statute directs that good cause be shown for the delay in filing the second amended petition. Based upon the pleading alone, the court does not find good cause for the delay in filing the second amended petition. These allegations were certainly known to the petitioner from the beginning of the case.

In dismissing the second amended petition, the post-conviction court also dismissed the claims raised in the original petition due to waiver and the failure to present sufficient factual allegations although both were filed with the assistance of counsel:

> The original post-conviction petition fails to present sufficient factual allegations to support the petition. It was done with the assistance of counsel. The specific claims were never amended to be supported by facts under oath. Furthermore, some of the claims are deemed to have been waived. The [second] amended petition was not timely filed and the court does not find good cause for the delay in filing. Thus, the original petition and its claims

- 17 -

along with the [second] amended petition and its claims are dismissed without further hearing.

We affirm the post-conviction court's judgment that Petitioner failed to demonstrate good cause in filing the second amended petition because the record does not preponderate against the court's factual finding. *See Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020) (citing Tenn. R. App. P. 13(d)). The record plainly shows that Petitioner filed his petition well outside the thirty-day requirement of Tennessee Code Annotated section 40-30-107(b)(2). Petitioner filed his initial petition on January 25, 2019; the post-conviction court entered its preliminary order on February 5, 2019; Petitioner filed his second amended petition on November 21, 2019, or 287 days after the post-conviction court entered its preliminary order. The fact that the post-conviction court did not state a concrete deadline for Petitioner to file an amended petition did not obviate Petitioner's duty to file the amended petition in a timely manner as required by statute, or seek an extension to do so which was not done in this case.

Petitioner urges this court to remand this case for an evidentiary hearing where he can prove his claim of ineffective assistance of trial counsel regarding the alleged offer as set out in the dismissed second amended petition. Absent from Petitioner's argument to this court is an explanation as to why a two-to-three-month delay in obtaining trial counsel's case file, difficulty in conferring with post-conviction counsel, and the post-conviction court's failure to set forth a deadline, caused or contributed to a filing delay of 287 days from the preliminary order or a seventy-two-day delay in filing the second amended petition from the first amended petition. Petitioner's reasons for the delay on appeal are inconsistent with what he claimed in his amended petitions and argued at the September and November 2019 hearings. Notably, Petitioner does not contend that the plea offer claim was uncovered long after the statutory deadline had passed thereby necessitating a delayed filing. In contrast, in the first amended petition, Petitioner alleged that he only discovered the juror misconduct claim during "post-trial investigation." Petitioner elaborated on this timeline at the November 2019 hearing through post-conviction counsel:

After the initial filing, we were able to secure an investigator, get funds for an investigator, and we had some delays in getting the Court – not the court file, but –

The Court: The transcript from the – yeah.

Counsel: Transcript and the attorneys' – previous counsel's file. That took about another three months. That brought us into, I believe, April or early May. We started our investigation. I immediately noticed a

- 18 -

family name amongst the jurors. That last name was Kuhlman. . . . I keyed in on that. And that's where I told my investigator to – to let's see if there's anything – if there's an in to talk to any of these jurors. We did our investigation with the list of jurors, and when I got a report, that's when we amended to include –

The Court: That was the second (sic) amendment on the –

Counsel: To include the juror misconduct, Judge.

Unlike the juror misconduct claim raised in the first amended petition, Petitioner's reasons for the delay in filing the second amended petition did not cause or contribute to the delay in asserting the plea offer claim in the original petition or a timely filed amended petition. Simply put, Petitioner has failed to establish good cause for having missed the first opportunity to represent the plea offer claim.

Moreover, Petitioner's reasons for the delay constitute the "press of other business" which does not excuse an extension under the Act. "The 'press of other business,' unless unforeseeable or beyond counsel's control, is not adequate 'justification upon which to base an extension of the court's schedules.'" *M.R.K. Corp. v. United States,* 6 Cl. Ct. 544, 545 (1984) (citing *Louisiana-Pacific Corporation v. United States*, 2 Cl. Ct. 743, 748 (1983) (footnote omitted)). Because Petitioner's reasons for the delayed filing were not excused by good cause, we affirm the post-conviction court's dismissal of the second amended petition.

## II.     Denial of An Impartial Jury – Juror Misconduct

Petitioner claims the post-conviction court erred in denying his claim of juror misconduct because seating Juror 6 resulted in a jury that was not fair and impartial. He contends that Juror 6's failure to disclose her relationship with the District Attorney, her prejudicial view of men of the Muslim faith, and her experience as the victim of an abusive former marriage, raised the presumption of actual bias. He also alleges that Juror 6 relied on extraneous information by researching the case on her cell phone. The State contends the post-conviction court properly denied Petitioner relief because Petitioner failed to establish the factual allegations by clear and convincing evidence. We agree with the State.[3]

---

[3]While the issue of juror misconduct was raised for the first time on post-conviction, the State did not raise waiver as an affirmative defense and in fact in its answer to the post-conviction petition, characterized the issue as a corum nobis/newly discovered evidence

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103. A petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. *Id.* § 40-30-110(f). "Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901, n.3 (Tenn. 1992)).

A post-conviction court's application of law to its factual findings are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland,* 610 S.W.3d at 455; *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013). However, the post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *Howard,* 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014). The petitioner bears the burden of establishing that the evidence preponderates against the post-conviction court's findings. *Cauthern v. State*, 145 S.W.3d 571, 597 (Tenn. Crim. App. 2004); *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015); *Whitehead,* 402 S.W.3d at 621. Therefore, this court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001); *Bates v. State,* 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

A defendant's right to trial by an impartial jury is guaranteed under the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Maurice "Ricky" Blocker*, No. W2020-00543-CCA-R3-PC, 2021 WL 3140357, at *11 (Tenn. Crim. App., at Jackson, July 26, 2021), *perm. app. denied* (Tenn. Dec. 8, 2021) (quoting *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013)). Voir dire is the process that allows the parties to question potential jurors in order to impanel a fair and impartial jury. *State v. Urshawn Eric Miller*, -- S.W.3d --, No. W2019-00197-SC-DDT-DD, 2021 WL 5810574, at *5 (Tenn. Dec. 7, 2021).

Challenges to juror qualifications may be (1) *propter defectum*, "on account of defect," or (2) *propter affectum*, "on account of prejudice." *See State v. Akins*, 867 S.W.2d

---

claim. It was undisputed that the alleged juror misconduct issue was not discovered until post-conviction counsel began its investigation.

350, 355 (Tenn. Crim. App. 1993). *Propter defectum* disqualifications are those based on alienage, family relations, or other statutory mandate and must be challenged before the return of a jury verdict. *Id.* *Propter affectum* disqualifications are based upon bias, prejudice, or lack of impartiality and may be made after the jury verdict. *Id.* Accordingly, a claim of juror bias may be asserted in a post-conviction petition. *See Maurice "Ricky" Blocker*, 2021 WL 3140357, at *11; *see also Steven James Rollins v. State*, No. E2010-01150-CCA-R3-PD, 2012 WL 3776696, at *14-24 (Tenn. Crim. App., at Knoxville, Aug. 31, 2012) (post-conviction relief granted where petitioner established by clear and convincing evidence that juror was presumptively biased and where State failed to overcome the presumption).

Bias of a juror has been defined as a propensity, prepossession, bent, inclination, or leaning of the mind toward an object or view, of which the mind cannot be indifferent. *Akins,* 867 S.W.2d at 354 (citing *Durham v. State*, 188 S.W.2d 555, 559 (1945). To prevail on a claim of juror bias, the defendant must establish a prima facie case of bias or partiality. *Id.* A presumption of juror bias arises "[w]hen a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality[.]" *Id.* at 355. In addition, "[s]ilence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer." *Id.* at 355. Thus, a juror's "failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." *Id.* at 356 (footnotes omitted). On the other hand, bias cannot be presumed in the absence of questions calculated to produce specific answers. *State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983); *see also State v. Pender*, 687 S.W.2d 714, 718 (Tenn. Crim. App. 1984) (the failure to volunteer the information that juror was an officer did not amount to concealment when neither side asked whether any juror worked in law enforcement).

A defendant's right to an impartial jury also prohibits jurors from being exposed to extraneous prejudicial information. *See Adams*, 405 S.W.3d at 650; *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984). Extraneous prejudicial information is broadly defined as information "coming from without" and more specifically defined as information that was not admitted into evidence but bears on a fact at issue in the trial. *Adams,* 405 S.W.3d at 650 (quoting *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987)); *see also Blackwell*, 664 S.W.2d 688-89. The party challenging the verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information. *Adams,* 405 S.W.3d at 651. Trial courts are guided by Tennessee Rule of Evidence 606(b), to determine whether evidence is admissible to challenge a verdict based on extraneous information. While a juror "may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions . . . to assent to or dissent from the verdict," a juror may testify on whether

"extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion[.]"

Once the challenging party has made the initial showing that the jury was exposed to extraneous prejudicial information, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless. *Adams*, 405 S.W.3d at 651; (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)).

This court's review rests with the post-conviction court's credibility findings. First, the post-conviction found Juror 6 to be a credible witness whose testimony about the prosecutor and the DA was unimpeached by the testimony of her former husband or Petitioner's post-conviction investigator. Concerning this claim, the post-conviction court found:

> [Juror 6] was clear during her testimony that she did not personally know [the prosecutor] or [the District Attorney General] during the trial. She also denied that she directly worked for [the District Attorney]'s campaign, although she volunteered for all Republican candidates in Knox County. Although she saw [the prosecutor and the District Attorney] at political events, she denied wa[]ving at [the prosecutor] or making faces at him during the trial.

> ***

> The court finds that [Juror 6], Mr. Kuhlman, and Ms. Walker were credible in their testimony regarding this issue. Although their testimony did not line up exactly, the court does not find that [Juror 6]'s statements regarding her connections to either [the prosecutor] or [the DA] were untruthful. A reasonable interpretation of the facts is that [Juror 6] had some contact with [the DA] during her campaign for DA due to the nature of [Juror 6]'s volunteering for all Republican candidates. The court finds her denials about any closer relationship to [the prosecutor] or [the DA] to be credible. [Juror 6] appears to have been truthful in her discussion of this issue to Ms. Walker. Nothing Mr. Kuhlman said directly contradicted [Juror 6] other than that she smiled and waved to [the prosecutor] during the trial. Mr. Kuhlman was not present during the trial and could not have observed any actions by [Juror 6]. He is simply relying on his memory of what he says she told him. The court

- 22 -

does not find this sufficient to impeach [Juror 6] when she says she did not act in that way.

Because the court found Juror 6 to be credible regarding any relationship or association with the DA and the prosecutor, the post-conviction court found no credible evidence that Juror 6 was biased in favor of the State:

> There is no credible evidence that [Juror 6] withheld information about her relationship with the Assistant District Attorney or the District Attorney. Only one juror indicated that they knew [the prosecutor] during the trial. That juror was excused for cause because his son and [the prosecutor's] stepson had played ball together. The record in this case demonstrates that, at best, [Juror 6] knew [the prosecutor] through his wife, the DA[.] That relationship was marked simply as a general volunteer for Republican political candidates that included [the DA]. There is no evidence that [Juror 6] had a close personal relationship with [the prosecutor] or the [DA] similar to cases where improper connections with attorneys disqualified a juror.

The record does not preponderate against the post-conviction court's findings. We defer to the post-conviction court's findings because of the court's unique position as the trier in fact in observing the testimonies of the three post-conviction witnesses. *See Anthony M. Clark v. State*, No. M2006-01176-CCA-R3-PC, 2007 WL 2295583, at \*7 (Tenn. Crim. App. Aug. 6, 2007) ("[b]ecause the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses") (quoting *Gillock v. Board of Professional Responsibility,* 656 S.W.2d 365, 367 (Tenn. 1983)).

While Juror 6 admitted that she was acquainted with the prosecutor and his spouse because she had volunteered for the spouse's campaign for county District Attorney, she steadfastly denied that volunteering for the DA's campaign led to a close personal relationship with the spouse or the prosecutor. She explained that she campaigned for all the Republican races as a volunteer which included the DA's election. Here, nothing in Juror 6's testimony revealed any significant connection between herself and the prosecutor and his spouse or suggested that Juror 6 held a bias in favor of the State as a result of this connection. Petitioner has failed to demonstrate a presumption of bias by clear and convincing evidence. He is not entitled to relief.

By the same measure, the post-conviction court listened to and weighed the contradictory testimonies of Juror 6 and her ex-husband regarding Juror 6's alleged failure to disclose her supposed bias against Muslim men. As to this claim, the post-conviction court found "no credible evidence" that Juror 6 was prejudiced toward Muslim men:

- 23 -

[T]here is no credible evidence to support the proposition that she possessed any prejudice toward Muslim men, had made disparaging references toward [Petitioner], or used any racial epithet toward the Petitioner or any other Muslim.

In reaching this conclusion, the post-conviction court in essence, accredited Juror 6's testimony over her former husband's:

Again, it is difficult for the court to determine who to believe on this issue. However, as stated . . . in the conclusions of law, even if the court were to believe Mr. Kuhlman's testimony on this issue, the court does not find that it establishes bias on the part of [Juror 6]. The fact that [Juror 6] and Mr. Kuhlman went through an apparently contentious divorce, the court does not find the ex-husband to be more credible than [Juror 6]. If [Juror 6] repeated the epithet of "towel head" at some point in her life, the court does not find this to be proof that she is biased against Muslim men, a category which also includes the alleged victim in this case. There is certainly no proof that she referred to the Petitioner in any derogatory manner.

Once again, we defer to the post-conviction court's findings. Juror 6 denied that she had any animus against male followers of the Muslim faith and specifically denied referring to Petitioner using Islamophobic terms. Petitioner has failed to show by clear and convincing evidence that Juror 6 was prejudiced. She denied any prejudice, and the post-conviction court accepted her testimony. We conclude that Petitioner is entitled to no relief.

Next, the post-conviction court found no evidence of bias or dishonesty regarding the claim that Juror 6 failed to reveal information that she was a victim of domestic violence:

[Juror 6] testified that she did not recall being asked during voir dire if she had ever been the victim of a crime. Investigator Natalie Walker testified that she didn't ask [Juror 6] if she had been a victim of a crime. The court is unaware of [Juror 6] or any other juror being asked if they had ever been a victim of a crime. In any event, the court does not find from the proof that [Juror 6] was dishonest about this issue.

The transcript of the voir dire demonstrates that the jurors were never asked if they had ever been the victim of a crime or more specifically, the victim of domestic violence. The record instead reflects that the State asked whether anyone had suffered "a significantly traumatic event where you've been beaten pretty seriously[.]" Petitioner has failed to

demonstrate by clear and convincing evidence that Juror 6 had in fact experienced abuse during a previous marriage. At the post-conviction hearing, she was asked if she was a victim of a crime at any point prior to the trial and she responded in the negative. The record shows that the investigator failed to ask Juror 6 whether she had been a victim of a crime. Moreover, the repeated attempts by both sides to encourage the panel to reveal anything that "may" not have been asked is insufficient to fault Juror 6 for revealing any information about abuse. Under the circumstances, Petitioner has failed to make a prima facie case of bias. He is not entitled to relief.

Lastly, the post-conviction court rejected Mr. Kuhlman's testimony that Juror 6 used her phone to research the law during the trial and concluded that Petitioner failed to carry his burden of proof by clear and convincing evidence:

> The court finds that it is doubtful that Mr. Kuhlman would have known what [Juror 6] was "researching" regarding the law, if it happened. She first denied doing any research during the trial and then stated that she had told another Assistant DA that she couldn't recall if she had researched the law. The court finds [Juror 6] credible. There is no evidence that [Juror 6] relied on anything other than the court's instructions on the law.
>
> ***
>
> [Juror 6] was the only witness who had first-hand knowledge of the proceedings. She denied any improper conduct. There were other jurors who would have possessed knowledge of improper conversations about extraneous information or deliberations prior to the conclusion of the proof, if such events had transpired. Two of them were specifically named during the hearing. However, they were not presented to the court. The burden is on the Petitioner.

This court defers to the post-conviction court's factual findings and affirm its conclusion of law. Petitioner failed to produce evidence to make the initial showing that the jury was exposed to extraneous prejudicial information. *Adams*, 405 S.W.3d at 651; *Walsh*, 166 S.W.3d at 647. The post-conviction considered and rejected Mr. Kuhlman's testimony that Juror 6 relied on extraneous information by using her phone to research the case. As the post-conviction court stated, there were two jurors who were identified at the post-conviction hearing and ultimately served on the jury. However, neither was called to testify in support of this claim. Because the evidence does not preponderate against the court's findings accrediting Juror 6's testimony, we affirm the denial of post-conviction relief as to this claim.

**Conclusion**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____

JILL BARTEE AYERS, JUDGE